RAILROAD COMPANY v. MANUFACTURING COMPANY.

When goods are delivered to a common carrier to be transported over his railroad to his depot in a place named, and there to be delivered to a second line of conveyance for transportation further on, the common-law liability of common carriers remains on the first carrier until he has

---

[*] Von Hoffman v. The City of Quincy, 4 Wallace, 535.

delivered the goods for transportation to the next one.   His obligation, while the goods are in his depot, does not become that of a warehouse-man.

2. The section in the charter of the Michigan Central Railroad Company, providing that the company shall not be responsible for goods on deposit in any of their depots "awaiting *delivery*," does not include goods in such depots awaiting *transportation;* but refers to such goods alone as have reached their final destination.

3. Although a common carrier may limit his common-law liability by special contract assented to by the consignor of the goods, an unsigned general notice printed on the back of a receipt does not amount to such a contract, though the receipt with such notice on it may have been taken by the consignor without dissent.

4. The court expresses itself against any further relaxation of the common-law liability of common carriers.

IN error to the Circuit Court for the District of Connecticut; the case being thus:

In October, 1865, at Jackson, a station on the Michigan Central Railroad, about seventy-five miles west of Detroit, one Bostwick delivered to the agent of the Michigan Central Railroad Company, for transportation, a quantity of wool consigned to the Mineral Springs Manufacturing Company, at Stafford, Connecticut, and took a receipt for its carriage, on the back of which was a notice that all goods and merchandise are at the risk of the owners while in the warehouses of the company, unless the loss or injury to them should happen through the negligence of the agents of the company.

The receipt and notice were as follows:

"MICHIGAN CENTRAL RAILROAD COMPANY,
"JACKSON, October 11th, 1865.

"Received from V. M. Bostwick, as consignor, the articles marked, numbered, and weighing as follows:

[Wool described.]

"To be transported over said railroad *to the depot* in Detroit, and there to be delivered to ——, agent, or order, upon the payment of the charges thereon, *and subject to the rules and regulations established* by the company, a part of which notice is given on the back hereof.   This receipt is not transferable.

"HASTINGS,
"Freight Agent."

The notice on the back was thus:

" The company will not be responsible *for damages occasioned* *by delays* from storms, accidents, *or other causes*, . . . and all goods and merchandise will be at the risk of the owners thereof *while in the company's warehouses, except such loss or injury as may arise from the negligence of the agents of the company.*"

Verbal instructions were given by Bostwick that the wool should be sent from Detroit to Buffalo, by lake, in steamboats, which instructions were embodied in a bill of lading sent with the wool. Although there were several lines of transportation from Detroit eastward by which the wool could have been sent, there was only one transportation line propelled by steam on the lakes, and this line was, and had been for some time, unable, in their regular course of business, to receive and transport the freight which had accumulated in large quantities at the railroad depot in Detroit. This accumulation of freight there, and the limited ability of the line of propellers to receive and transport it, were well known to the officers of the road, but neither the consignor, consignee, nor the station-master at Jackson, were informed on this subject. The wool was carried over the road to the depot in Detroit, and remained there for a period of six days, when it was destroyed by an accidental fire, not the result of any negligence on the company's part. During all the time the wool was in the depot it was *ready to be delivered* for further transportation to the carrier upon the route indicated.

In consequence of the loss the manufacturing company sued the railroad company. The charter of the company, which was pleaded and offered in evidence, contained a section thus:

" The said company may charge and collect a reasonable sum for storage upon all property which shall have been transported by them upon delivery thereof at any of their depots, and which shall have remained at any of their depots more than four days; *Provided*, that elsewhere than at their Detroit depot, the consignee shall have been notified if known, either personally or by

notice left at his place of business or residence, or by notice sent by mail, of the receipt of such property at least four days before any storage shall be charged, and at the Detroit depot such notice shall be given twenty-four hours (Sundays excepted) before any storage shall be charged; but such storage may be charged after the expiration of said twenty-four hours upon goods not taken away; *Provided,* that in all cases the said company shall be responsible for goods on deposit in any of their depots *awaiting delivery,* as warehousemen, and not as common carriers."

The controversy, of course, was as to the nature of the bailment when the fire took place. If the railroad company were to be considered as warehousemen at the time the wool was burned, they were not liable in the action, as the fire which caused its destruction was not the result of any negligence on their part. If, on the contrary, their duty as carriers had not ceased at the time of the accident, and there were no circumstances connected with the transaction which lessened the rigor of the rule applicable to that employment, they were responsible; carriers being substantially insurers of the property intrusted to their care.

The court was asked by the railroad company to charge the jury that its liability was the limited one of a warehouseman, importing only ordinary care. The court refused so to charge, and, on the contrary, charged that the railroad company were liable for the wool as common carriers, during its transportation from Jackson to Detroit, and after its arrival there, for such reasonable time as, according to their usual course of business, under the actual circumstances in which they held the wool, would enable them to deliver it to the next carrier in the line, but that the manufacturing company took the risk of the next carrier line not being ready and willing to take said wool, and submitted it to the jury to say whether under all the circumstances of the case in evidence before them, such reasonable time had elapsed before the occurrence of the fire.

The jury, under the instructions of the court, found that the railroad company were chargeable as carriers, and this writ of error was prosecuted to reverse that decision.

*Mr. F. Chamberlin, for the plaintiff in error:*

1. The railroad company was not liable even by the severe rule of the common law, and independently of the proviso in their charter, and of the notice.

The law on the subject is thus stated by Judge Story, in his work on bailments:

"If a carrier between A. and B. receives goods to be carried from A. to B., and thence forwarded by a distinct conveyance to C., as soon as he arrives with the goods at B. and deposits them in his warehouse there, his responsibility as *carrier* ceases, for that is the termination of his duty *as such. He then becomes as to the goods a mere warehouseman,* undertaking for their further transportation." *

The language of the same book in another place is equally pertinent and significant: †

"When the goods have arrived at the place of their fixed destination and are there deposited in the carrier's warehouse, to await the convenience of the owner in sending for them, *or for the purpose of being forwarded by some other carrier to another place,* then his duty as carrier ends on the arrival of the goods at his (the carrier's) warehouse, and his duty as warehouseman commences."

There is no difference which is of substance to the manufacturing company between goods to be delivered to the owner at their final destination and goods deliverable to the owner or his agent for further carriage.

The controlling fact is, that the plaintiff's duty *of carriage* is completed, and the goods are stored for the convenience of the owner. The office of the plaintiffs is in both cases the same, the carriage is the same, and the delivery to the person entitled to receive them is the same in the one case as in the other. If the goods are to go farther, by an independent line, the next carrier stands in place of the owner

---

* See. 538.

† See. 448; and see Garside *v.* Trent Navigation Co., 4 Term, 581, and Moore *v.* Michigan Central Railroad Co., 3 Michigan, 39.

or consignee, so far as the first carrier is concerned, and as soon as the function of carriage proper is performed, that is, in this case, as soon as we place them in the depot " ready to be delivered" over, they are " awaiting delivery."

There was indeed, in this case, no offer to deliver, as owing to their limited means of transportation, by the line of propellers, any such offer would have been a useless act. *Lex nemi rem cogit ad vana.*

If it be said that the railroad company knew of this inability of the line of propellers and should have not taken this wool, the answer is that as common carriers, having, themselves, ample means of carriage, the railroad company could not have declined to receive any goods to be carried so far as their line extended; that is to say, to Detroit. They were bound to take the wool to that point.

2. But if liable by the rules of the old common law, still by the very terms of the railroad company's charter, the company, while the wool should be in deposit in a depot "*awaiting* delivery," was not to be responsible as common carriers, but only as warehousemen. Now, this case is that while the wool was in the depot "*ready to be delivered*," &c., it was destroyed. This brings matters within the terms of the proviso, unless we raise a distinction—one which has no foundation in reason—between a case in which the goods are at the final terminus of their carriage, and this in which they were to be delivered to another carrier, selected by the defendant in error, for further carriage.

3. Independently of this, there was a notice, in plain terms, to the consignor, and this was the condition of the contract, that all goods and merchandise would be at the risk of the owners thereof, while in the company's warehouses, except such loss or injury as might arise from the negligence of the agents of the company. Now, the receipt without dissent by a consignor of a bill of lading, by which the carrier stipulates against liability for loss by fire, discharges the carrier from liability for such loss not caused by his own negligence. And in an action against the carrier, evidence is not admissible, in the absence of fraud, to

show that the consignor did not read the terms of the bill of lading.*

Since the case of *York Compy.* v. *Central Railroad Co.,*† in this court, it can no longer be doubted that the common-law liability of a carrier for the safe carriage of goods *may* be limited and qualified by special contract with the owner, provided that such special contract do not attempt to cover losses by negligence or misconduct.

. *Mr. A. P. Hyde, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

· It is not necessary in the state of this record to go into the general subject of the duty of carriers in respect to goods in their custody which have arrived at their final destination. Different views have been entertained by different jurists of what the carrier is required to do when the transit is ended in order to terminate his liability, but there is not this difference of opinion in relation to the rule which is applicable while the property is in process of transportation from the place of its receipt to the place of its destination.

In such cases it is the duty of the carrier, in the absence of any special contract, to carry safely to the end of his line and to deliver to the next carrier in the route beyond. This rule of liability is adopted generally by the courts in this country, although in England, at the present time, and in some of the States of the Union, the disposition is to treat the obligation of the carrier who first receives the goods as continuing throughout the entire route. It is unfortunate for the interests of commerce that there is any diversity of opinion on such a subject, especially in this country, but the rule that holds the carrier only liable to the extent of his own route, and for the safe storage and delivery to the next carrier, is in itself so just and reasonable that we do not hesitate to give it our sanction. Public policy, however, requires that the rule should be enforced, and will not allow

---

\* Grace *v.* Adams, 100 Massachusetts, 505.          † 3 Wallace, 107.

the carrier to escape responsibility on storing the goods at the end of his route, without delivery or an attempt to deliver to the connecting carrier. If there be a necessity for storage it will be considered a mere accessory to the transportation, and not as changing the nature of the bailment. It is very clear that the simple deposit of the goods by the carrier in his depot, unaccompanied by any act indicating an intention to renounce the obligation of a carrier, will not change or modify even his liability. It may be that circumstances may arise after the goods have reached the depot which would justify the carrier in warehousing them, but if he had reasonable grounds to anticipate the occurrence of these adverse circumstances when he received the goods, he cannot by storing them change his relation towards them.

Testing the case in hand by these well-settled principles, it is apparent that the plaintiffs in error are not relieved of their proper responsibility, unless through the provisions of their charter, or by the terms of the receipt which was given when they received the wool. They neither delivered nor offered to deliver the wool to the propeller company. Nor did they do any act manifesting an intention to divest themselves of the character of carrier and assume that of forwarder.

It is insisted that the offer to deliver would have been a useless act, because of the inability of the line of propellers, with their means of transportation, to receive and transport the freight which had already accumulated at the Michigan Central depot for shipment by lake. One answer to this proposition is, that the company had no right to assume, in discharge of its obligation to this defendant, that an offer to deliver this particular shipment would have been met by a refusal to receive. Apart from this, how can the company set up, by way of defence, this limited ability of the propeller line when the officers of the road knew of it at the time the contract of carriage was entered into, and the other party to the contract had no information on the subject?

It is said, in reply to this objection, that the company

could not have refused to receive the wool, having ample means of carriage, although it knew the line beyond Detroit selected by the shipper was not at the time in a situation to receive and transport it. It is true the company were obliged to carry for all persons, without favor, in the regular course of business, but this obligation did not dispense with a corresponding obligation on its part to inform the shipper of any unavoidable circumstances existing at the termination of its own route in the way of a prompt delivery to the carrier next in line. This is especially so when, as in this case, there were other lines of transportation from Detroit eastward by which the wool, without delay, could have been forwarded to its place of destination. Had the shipper at Jackson been informed, at the time, of the serious hindrances at Detroit, to the speedy transit of goods by the lake, it is fair to infer, as a reasonable man, he would have given a different direction to his property. Common fairness requires that at least he should have been told of the condition of things there, and thus left free to choose, if he saw fit, another mode of conveyance. If this had been done there would be some plausibility in the position that six days was an unreasonable time to require the railroad company to hold the wool as a common carrier for delivery. But under the circumstances of this case the company had no right to expect an earlier period for delivery, and cannot, therefore, complain of the response of the jury to the inquiry on this subject submitted to them by the Circuit Court.

It is earnestly argued that the plaintiffs in error are relieved from liability under a provision contained in one section of their charter,* if not by the rules of the common law.

But it is quite clear, on reading the whole section, that it refers to property which has reached its final destination, and is there awaiting delivery to its owner. If so, how can the proviso in question be made to apply to another and distinct class of property? To perform this office it must act independently of the rest of the section, and enlarge, rather

---

* See the section, *supra*, pp. 320–321.—REP.

than limit, the operation of it.   This it cannot do, unless words are used which leave no doubt the legislature intended such an effect to be given to it.

It is argued, however, that there is no difference between goods to be delivered to the owner at their final destination and goods deliverable to the owner, or his agent, for further carriage.   That in both cases, as soon as they are "ready to be delivered" over, they are "awaiting delivery."   This position, although plausible, is not sound.   There is a clear distinction, in our opinion, between property in a situation to be delivered over to the consignee on demand, and property on its way to a distant point to be taken thence by a connecting carrier.   In the former case it may be said to be awaiting delivery; in the latter, to be awaiting transportation.   And this distinction is recognized by the Supreme Court of Michigan in the case of the present plaintiffs in error against Hale.*   The court in speaking on this subject say, "that goods are on deposit in the depots of the company, either awaiting transportation or awaiting delivery, and that the section (now under consideration) has reference only to goods which have been transported and placed in the company's depots for delivery to the consignee."   To the same effect is a recent decision of the Court of Appeals of New York,† in a suit brought to recover for the loss of goods by the same fire that consumed the wool in this case, and which were marked for conveyance by the same line of propellers on Lake Erie.

It is insisted, however, by the plaintiffs in error, if they are not relieved from liability as carriers by the provisions of their charter, that the receipt taken by the consignor, without dissent, at the time the wool was received, discharges them.   The position is, that the unsigned notice printed on the back of the receipt is a part of it, and that, taken together, they amount to a contract binding on the defendants in error.

* 6 Michigan, 243.
† Mills v. Michigan Central Railroad Co., 45 New York, 626.

This notice is general, and not confined, as in the section of the charter we have considered, to goods on deposit in the depots of the company awaiting delivery. It is a distinct announcement that all goods and merchandise are at the risk of the owners thereof while in the company's warehouses, except for such loss or injury as may arise from the negligence of the agents of the company. The notice was, doubtless, intended to secure immunity for all losses not caused by negligence or misconduct during the time the property remained in the depots of the company, whether for transportation on their own line, or beyond, or for delivery to consignees. And such will be its effect if the party taking the receipt for his property is concluded by it. The question is, therefore, presented for decision whether such a notice is effectual to accomplish the purpose for which it was issued.

Whether a carrier when charged upon his common-law responsibility can discharge himself from it by special contract, assented to by the owner, is not an open question in this court since the cases of *The New Jersey Steam Navigation Company* v. *The Merchants' Bank*,* and *York Company* v. *Central Railroad*.† In both these cases the right of the carrier to restrict or diminish his general liability by special contract, which does not cover losses by negligence or misconduct, received the sanction of this court. In the former case the effect of a general notice by the carrier seeking to extinguish his peculiar liability was also considered, and although the remarks of the judge on the point were not necessary to the decision of the case, they furnish a correct exposition of the law on this much-controverted subject.

In speaking of the right of the carrier to restrict his obligation by a special agreement, the judge said: "It by no means follows that this can be done by an act of his own. The carrier is in the exercise of a sort of public office, from which he should not be permitted to exonerate himself without the assent of the parties concerned. And this is not to be implied or inferred from a general notice to the public

---

* 6 Howard, 344.                    † 3 Wallace, 107.

limiting his obligation, which may, or may not, be assented to. He is bound to receive and carry all the goods offered for transportation, subject to all the responsibilities incident to his employment, and is liable to an action in case of refusal. If any implication is to be indulged from the delivery of the goods under the general notice, it is as strong that the owner intended to insist upon his rights and the duties of the carrier, as it is that he assented to their qualification. The burden of proof lies on the carrier, and nothing short of an express stipulation by parol or in writing should be permitted to discharge him from duties which the law has annexed to his employment."

These considerations against the relaxation of the common-law responsibility by public advertisements, apply with equal force to notices having the same object, attached to receipts given by carriers on taking the property of those who employ them into their possession for transportation. Both are attempts to obtain, by indirection, exemption from burdens imposed in the interests of trade upon this particular business. It is not only against the policy of the law, but a serious injury to commerce to allow the carrier to say that the shipper of merchandise assents to the terms proposed in a notice, whether it be general to the public or special to a particular person, merely because he does not expressly dissent from them. If the parties were on an equality in their dealings with each other there might be some show of reason for assuming acquiescence from silence, but in the nature of the case this equality does not exist, and, therefore, every intendment should be made in favor of the shipper when he takes a receipt for his property, with restrictive conditions annexed, and says nothing, that he intends to rely upon the law for the security of his rights.

It can readily be seen, if the carrier can reduce his liability in the way proposed, he can transact business on any terms he chooses to prescribe. The shipper, as a general thing, is not in a condition to contend with him as to terms, nor to wait the result of an action at law in case of refusal to carry unconditionally. Indeed such an action is seldom

resorted to, on account of the inability of the shipper to delay sending his goods forward. The law, in conceding to carriers the ability to obtain any reasonable qualification of their responsibility by express contract, has gone as far in this direction as public policy will allow. To relax still further the strict rules of common law applicable to them, by presuming acquiescence in the conditions on which they propose to carry freight when they have no right to impose them, would, in our opinion, work great harm to the business community.

The weight of authority is against the validity of the kind of notices we have been considering.* And many of the courts that have upheld them have done so with reluctance, but felt themselves bound by previous decisions. Still they have been continued, and this persistence has provoked legislation in Michigan, where this contract of carriage was made, and the plaintiffs in error have their existence. By an act of the legislature passed after the loss in this case occurred, it is declared "that no railroad company shall be permitted to change or limit its common-law liability as a common carrier by any contract or in any other manner, except by a written contract, none of which shall be printed, which shall be signed by the owner or shipper of the goods to be carried."†

It is fair to infer that this kind of legislation will not be confined to Michigan, if carriers continue to claim exemption from common-law liability through the medium of notices like the one presented in defence of this suit.

These views dispose of this case, and it is not necessary to notice particularly the instructions which the court below gave to the jury. If the court erred at all it was in charging more favorably for the plaintiffs in error than the facts of the case warranted.

                                         JUDGMENT AFFIRMED.

---

* See 2 Parsons on Contracts, 238, note N, 5th edition ; and the American note to Coggs v. Bernard, 1 Smith's Leading Cases, 7th American edition ; Redfield Law of Railways, p. 369 ; McMillan v. M. S. & N. I. R. R. Co., 16 Michigan, p. 109, and following.

† Statutes of Michigan, Compilation of 1871, p. 783, ₴ 2386.