## A. J. WOOTEN *v.* B. GWIN, EXECUTOR, ETC.

1. AGRICULTURAL LIEN. *Rent. Cotton under lien. Special action for damages against purchaser.*

Sect. 11 of an act approved April 15, 1872, entitled "An act to secure the payment of wages for labor and liabilities for supplies," provided "that if any

person shall knowingly sell or remove any agricultural product subject to any lien under this act, without having first satisfied such lien, such person shall be deemed guilty of a misdemeanor," etc. By the first section of an act approved the 17th of April, 1873, the act of 1872 was "so amended as to extend the provisions thereof to all cases in which any person may be working for, or otherwise interested in, a share or part of the crop, to secure to such person an equitable division of the same, before such crop, or any part thereof, shall be in any manner disposed of, or removed from the premises on which it was produced," etc. Sect. 3 of· the latter act declares that, for any such removal or disposition of the crop, done without the consent of the persons interested, the offender shall be deemed guilty of a misdemeanor, and punished as provided in sect. 11 of the act of 1872. The act of 1872, as amended, gave a first lien in favor of the laborer, for wages or a part of the crop, and in favor of the employer for supplies, and the landlord for rent, and provided a summary remedy for the enforcement of such liens by seizure of the crop. Cotton upon which a landlord had a lien for rent, under these statutes, was removed from the demised premises by the tenant, and sold at a railroad town, to a merchant having no notice of the lien; but while the cotton was in his possession the landlord notified him of the lien, and demanded the cotton. The merchant refused to deliver up the cotton, or to point it out to the landlord, and shipped it out of the State. The landlord sued him in a special action on the case for the damage resulting from the tortious removal of the cotton, as averred, by which the lien was defeated. *Held*, that the action is not maintainable.

2. SAME. *Landlord's rights and remedies. Opinions of the several judges.*
   Upon the case above stated, SIMRALL, C. J., *held* that the special action on the case did not lie, because the merchant did not remove, or participate in the removal, of the cotton from the demised premises; but that, if he had done so, the action would lie. CAMPBELL, J., *held* that such action did not lie in this case, and would not lie in any other state of case, because not authorized by the statute; and that the remedy prescribed by the statute is exclusive of all others. CHALMERS, J., *held* that the merchant was liable in this action, because (1) the shipment of the cotton out of the State, and thus defeating the landlord's lien, is a penal offence under the statute, and, as such, subjects the offender to a civil action; and (2) such shipment is, independently of the penal statute, a civil tort, an unlawful destruction of the legal rights of the landlord, for which the wrong-doer is answerable in damages.

ERROR to the Circuit Court of Marshall County.

Hon. J. W. C. WATSON, Judge.

The case is fully stated in the opinion of SIMRALL, C. J.

*E. M. Watson*, for the plaintiff in error.

The plaintiff has the right to recover in this action the actual damage suffered by him on account of Westmoreland's wrongful act in removing the cotton. The unlawfulness of the act complained of is often the test of the defendant's lia-

bility.　24 Miss. 93 ; 2 Scam. 434 ; 3 Barb. 42 ; 22 Pa. St. 54 ;
9 Md. 108 ; 1 Hill. on Torts, 105, sect. 23 ; 16 Ind. 312. By
his wrongful act, Westmoreland was benefited and Wooten
was injured. The latter's right of action is, therefore, per-
fect. 2 Mass. 111 ; 16 Litt. 101 ; 36 Me. 322. "Where a law
requires any one to do an act for the benefit of another, or to
forbear the doing of that which may be to the injury of an-
other, if the law be violated, the party injured shall have an
action, though none be provided by the law." 2 Ld. Raym.
953 ; 1 El. & Bl. 111 ; 10 Co. 75 ; 3 Rob. Pr. 424 ; 1 Hill. on
Torts, 109.

The fact that the statute prescribes a penalty for the unlawful
removal of cotton does not preclude an action by an injured
party. 8 Ad. & E. (N. S.) 65 ; 3 El. & Bl. 412 ; 1 Add. on
Torts, 50 ; 1 Strobh. 525 ; 9 Shep. 371 ; 3 Fost. 83 ; 1 Exch.
877. Westmoreland, by removing the cotton from the State,
deprived Wooten of the benefit of his lien ; and, while the stat-
ute prescribes a penalty for such removal, it gives Wooten no
remedy for his damage. In such case, the common law supplies
the remedy. 1 Chitty's Pl. 82–90. Wooten's right of action
here is analogous to the landlord's right of action where the
sheriff removes or sells the tenant's property, without first pay-
ing a year's rent to the landlord. 3 Dana, 209 ; 43 Miss. 467.

*E. M. Watson*, also argued the case orally.

*Lawrence Johnson* and *Featherston & Harris*, for the de-
fendant in error.

Westmoreland was not amenable to Wooten in an action for
money had and received, nor for damages as sought in this
action. Wooten failed to pursue his remedy under the acts of
1872 and 1873, and he is not entitled to any other remedy.
The remedy provided in those statutes is exclusive of all
others. *Westmoreland* v. *Wooten*, 51 Miss. 825 ; *Cloud* v.
*The State*, 53 Miss. 664 ; *Hargrove* v. *Boskins*, 50 Miss. 197 ;
*Brown* v. *Beatty*, 5 Ga. 243 ; Sedgw. on Stat. & Const. Law,
94, 343.

There is no testimony in the record on which a judgment

could be rendered against the defendant, whether the form of action be *ex contractu* or *ex delicto*. The authorities relied on by the plaintiff in error are not applicable to the facts of this case.

*W. S. Featherston*, of counsel for the defendant in error, argued the case orally.

The Judges delivered opinions *seriatim*.

SIMRALL, C. J.:

This case was once before in this court, and will be found reported in 51 Miss. 825. The question then presented was, whether Westmoreland, who had purchased two bales of cotton from one of Wooten's tenants, was liable in *assumpsit* for its value.

The cotton was under the lien created by the act of 1873 (Pamph. Acts, 79) in favor of the landlord, to whom there was due a balance for rent. The tenant had removed the cotton from the demised premises, and sold it to Westmoreland. The decision was, that the purchaser was not liable to the landlord for the value of the cotton, or so much of the value as would satisfy the balance due him for rent.

On the return of the case to the Circuit Court, the demand against Westmoreland was presented in a new form. In effect, the form of the action was changed from *assumpsit* to the special action on the case. Westmoreland was charged with a tortious disposition and removal of the cotton, so that Wooten could not enforce his lien upon it.

The cotton was offered for sale by the tenant, at a railroad station in Marshall County. At the time Westmoreland bought, he did not know that Wooten had any claim upon it, nor was he cognizant of any facts that would suggest inquiry. Before he shipped the cotton to a market out of this State, Wooten informed him of his claim on the cotton and made a demand for it. He declined to surrender it, or to point it out, so that it might be taken into possession by an officer who had a writ authorizing its seizure.

From the verdict and judgment in favor of the defendant, Wooten has removed the case into this court by writ of error.

The first section of the act of the 17th of April, 1873 (Sess. Acts, p. 79), gives a lien to the landlord on the crops raised on the demised premises (which applies to the whole crop), to secure an equitable division "before such crop, or any part thereof, shall in any manner be disposed of, or removed from the premises on which it was produced." The idea advanced is, that the tenant shall not dispose of, or remove the commodities from the premises, until there has been a proper division of them, so that the landlord shall get his part for the rent.

The same idea is distinctly intimated in the third section, which denounces a penalty against any person who shall violate the provisions of this act by selling, disposing of, or removing any crop, or part thereof, before the interests of the parties interested have been separated by a division as contemplated in the first section. This statute, together with that of the 5th of April, 1872 (Acts, p. 131), of which it is an amendment, gives reciprocal liens to the tenant, cropper on shares, laborer for wages, etc., so as to secure to each his interest, and its segregation from other interests, "before the crop shall be sold, disposed of, or removed."

The crop is treated as a common mass, in which several parties have interests, and the intent is that none of them shall sell, dispose of, or remove, any part of it until these several interests have been adjusted and separated.

The lien takes hold of the agricultural products as an entirety, and is primarily designed to retain them on the land until the parties who have interests have had a division. The remedy devised by the act of 1872 is in aid of an enforcement of the lien. It is adapted to those cases where the products can be taken into possession by the officer, and held amenable to the ultimate decision.

But there are cases where the statutory remedy would be

abortive, because the crops had been so disposed of that no seizure could be made.

I think the rule is general that, to prevent a failure of justice, or to enforce a clear and well-defined legal right, the injured party may maintain the special action on the case whenever he shows that he has sustained damage from the tortious act of another, for which the established forms of law furnish no remedy. That is very much the formula in which accredited authors state it.

It was held to be the proper form of action in *Hussy* v. *Peebles*, 53 Ala. 438, to redress the landlord for the tortious removal and disposition of cotton, under a statute similar to ours.

The *right* which Wooten, the landlord, had, was that the cotton should remain on the demised premises until he had got his portion for rent. The wrong which was done to him was the removal of the cotton by Smith, the tenant. Whether Westmoreland participated in the tortious act by which the cotton was lost to Wooten, can be answered only by a consideration of his connection with the cotton. It was decided in this case (reported in 51 Miss. 825) that the landlord did not have such interest in the cotton as conferred a right of property; and could, therefore, maintain no action at law, which rested upon that title.

In *Grant* v. *White*, 9 Iowa, 153, it was said that the statute of that State which created a "lien on the crops and other effects used on the demised premises, was analogous to, and of the like virtue of, that class of liens in the common law accompanied with and dependent on possession." In *Webb* v. *Marshall*, 13 Wall. 15, the same force was given by the Supreme Court of the United States to the lien of the landlord, under the act of Congress of 1867, applicable to the District of Columbia. This act gave " a tacit lien on the personal chattels of the tenant situated on the premises, * * * the *lien* to commence with the tenancy, and continue for three months after the rent became due," etc.

In the case last cited, and in 16 Wall. 330, the attention of the court was directed to the scope of the lien, and the consequences of removal of effects within the time limited for its continuance. The lien took effect from the beginning of the term, and attached to the effects then on the premises, and upon others as they were brought there. It was said, referring to the ruling of the Iowa court in the case cited (*supra*), that the lien impressed itself on the effects of the tenant, rather as a " mass " than upon each article in detail ; and the deduction from these premises was, that if the goods were removed and sold in due course of trade, the lien would be lost.

The lien would take hold of all the goods which the shop-keeper had, or might put in his storehouse ; and yet, his business was to sell to his customers and replenish his stock. If the goods could be followed by the landlord into the possession of the purchasers, it would so embarrass that sort of mercantile business that it could not be safely carried on. Pressed by the serious and disastrous results which would ensue if that effect were given to the lien, the courts of Iowa and Missouri have held that, whether the effects of the tenant be the products of the farm, or goods on urban premises, the lien is rather upon the mass than the detail ; and, therefore, if parcels are sold and removed in due course of trade, *bonâ fide*, the lien is lost. Certainly so if, after removal, they are bought in good faith, and in ignorance of the landlord's claim. The landlord would not be predjudiced by a fraudulent removal.

*Knox* v. *Porter*, 18 Mo. 245, 246, arose under a statute passed in 1845, which enacted that " the landlord shall have a lien upon the crops * * * for eight months." Part of the crop had been sold, and the question was, how far could the landlord pursue it. He could take it, said the court, from an assignee, " if the assignment was *voluntary*, or taken with knowledge of the lien."

*Nesbit* v. *Bartlett*, 14 Iowa, 485, tested the right of the

landlord where a removal and sale had been made by a rural tenant. The statute gave the lien on the " crops " and the " effects *used* " on the premises. The term commenced in March. In May or June the tenant took off and sold a cow. The controversy was between the landlord and the purchaser, The purchaser knew that the tenant lived on the premises, and that the cow had been used there three or four months before his purchase; but he bought in good faith. All the judges agreed that, under the circumstances of this case, the animal was not amenable to the rent. Of the reasons assigned were, " The purchase was in good faith." " Common reason [said the court] would dictate that the purchaser took the property freed from the supposed lien."

The Alabama statute of 1843 prohibited the removal from the premises of the crop, until payment or tender of rent. If removed, or about being removed, an attachment could be taken out by the landlord. Code Ala., sects: 2961, 2963. In *Hussy* v. *Peebles*, 53 Ala. 434, it was held that any person, other than a *bonâ fide* purchaser, who made way with the products, was liable to the landlord in an action on the case. Previous decisions had determined that the landlord had a lien, but not a right of property, or of possession. *Hawkins* v. *Gill*, 6 Ala. 620.

The principle, with more or less distinctness enunciated by the authorities cited, is that the lien, in certain circumstances, may be extinguished by removal and sale to a *bonâ fide* purchaser. It was held, very early after the passage of the English statute of Anne, that the sheriff was liable in an action on case, if he levied upon and removed the goods of the tenant without paying a year's rent to the landlord, if so much was due, provided he had notice that rent was due. *Henchett* v. *Wilson*, 1 Wils. 140; *Lane* v. *Crockett*, 7 Price, 566. But a purchaser from the sheriff would get a good title. 7 Bing. 243; *Ex parte Groves*, 1 Atk. 104.

The statute of 1873 should be regarded as enlarging the security of the landlord. Prior to that, he had no lien; only

certain privileges, not accorded to other creditors, for the collection of his debt. The most valuable of these was the right to pursue the goods of the tenant for thirty days, and seize them, provided they had not been bought in good faith. The tenant, under the present law, is the owner (as he was under the former), but subject to a lien on the whole mass of the products. He has also the possession. The precise extent of the right of the landlord is, primarily, to enforce his right whilst the property is in the mass on the premises. But, if removed, he can put in force the remedies prescribed by the act of 1872; nor is he confined to thirty days, or any other time; his lien lasts as long as his debt, if the products continue in their original form, and have not lost their identity.

Every removal by the tenant, and those who confederate with him, before the landlord has got his interest, is wrongful, because forbidden by the statute, unless it be with the landlord's consent. The lien conferred by the acts of 1872 and 1873 has been declared by this court to be broader than the courts of other States, as we have seen, give to statutes quite analogous. When this case was formerly before us, Wooten was denied a recovery, because he was confined, as to Westmoreland, to his statutory remedies. His lien was not limited as to time, as was the right to follow and attach goods removed by the tenant from the premises, under sect. 1664 of the Code. Nor was there a saving clause in favor of a *bonâ fide* purchaser, as given by the Code. The *lien* was a superadded security, which the landlord never had before; the prohibition to remove was a support to it. This lien, as we have held, was a charge on the products, which adhered to them, so that the landlord might subject them to his demand. If innocent third persons, in open market, bought cotton, which is of no value to the producer except for its sale value, which is raised, not for consumption or use on the farm, but for market, the only risk to which they were exposed by these statutes was a seizure of the articles in their possession, under the landlord's right.

But, in addition to the lien, the statute prohibits a removal from the demised premises before others having shares in the crop, or other interests in it, have been satisfied.

That offence, punishable under the third section, is a special injury to the landlord, or other person protected by the statute. It is an invasion of a well-defined legal right; and if it should result in the loss or destruction of the right, no specific remedy being provided by the statute for its redress, the special action on the case was devised for such wrongs, and is appropriate. But the act declared to be wrongful is a removal from the demised premises, or such disposition as carries the property off the premises. The tenant, or other person liable, is any one who participates in such unlawful disposition or removal.

Westmoreland did not remove the cotton, or participate in it. He was not a confederate with the tenant in the tort; therefore he is not liable in this action.

Judgment affirmed.


CAMPBELL, J. :

I favor the affirmance of the judgment, because I hold that the right and the remedy of the landlord are the special creation of the statute, exist in accordance with it, and are limited by it; and, therefore, that the lien may be made effective by the seizure of that on which it operates, and in no other way.

It is just to assume that the Legislature, in conferring a right and providing a remedy for its enforcement, gave the only right or remedy intended to be enjoyed by the objects of its solicitude.

It gave a new right and an appropriate remedy, and provided a penalty against the act by which the remedy would be made unavailing and the right be destroyed. The remedy given by the statute is exclusive of all others.


CHALMERS, J., dissenting. .

I cannot concur in the conclusion reached. The testimony

Chalmers, J., dissenting.

establishes the fact that Westmoreland sent the cotton out of the State, or permitted it to be done, for his benefit, after he had notice of the landlord's unsatisfied lien, and sold and converted it to his own use.

Was he guilty of a tort in so doing, and can he be made liable at the suit of the landlord in an action upon the case?

If not, a grievous wrong has been done the landlord, who is left without a remedy, while the tort-feasor has enriched himself at his expense, by an act deliberately designed to accomplish that end. The fact that Westmoreland had purchased the cotton without notice of the lien does not affect the question, since we all agree that the product still remained subject to the lien, and would have so remained as long as it could be found in the State, no matter how many hands it might have passed through. The shipment to New Orleans took place after he had full knowledge of the landlord's claim, and the shipment beyond the State was the only act by which it was possible to defeat the lien. The case stands, therefore, exactly as if he had purchased the cotton with knowledge of the lien, and thereafter shipped it; because it was the sending beyond the limits of the State, and not the purchase, which defeated the security created by the statute for the protection of the landlord. The question presented, therefore, may be thus stated : Can a landlord maintain an action on the case against a purchaser (with or without notice) of cotton raised on the demised premises, who, after full knowledge of the unsatisfied lien, ships it out of the State, and converts it to his own use, it being shown that the landlord was thereby deprived of all opportunity of collecting his rent?

I have no hesitation in answering this question in the affirmative, on two grounds : First, because such act of shipment is, by statute, made a penal offence ; and, being so made, it subjects the offender to civil liability to any person aggrieved thereby ; and, second, because, independently of the penal statute, such shipment would be a civil tort, an unlawful destruction or impairment of the legal rights of the landlord,

for which the shipper is pecuniarily liable for the damage sustained.

My associates think that the penal clauses of the statutes establishing liens on agricultural products are confined to the act of removing the product from the demised premises, and that no subsequent removal falls beneath their condemnation.

Let us see: two statutes alone can be regarded in determining this question, to wit, those of 1872 and 1873, since this suit originated before the passage of the subsequent acts.

By the act of 1872 (Sess. Acts, 131), a lien was created on all agricultural products in favor of all laborers, to insure collection of their wages, and in favor of every employer to insure collection for all supplies advanced to his laborers. These liens are declared to be " first liens," superior to all others. They are annexed to and inhere in the product, and are not affected, as we all think, by any transfer and purchase of the product, whether with or without notice of the lien.

For their greater security, it is enacted by sect. 11 of the act that, " if any person shall *knowingly* sell or remove any agricultural product subject to any lien under this act, without having first fully paid up and satisfied such lien, such person shall be guilty of a misdemeanor, and shall be fined and imprisoned," etc.

There is no allusion in this section, nor in any other portion of the act, to the demised premises, nor to any removal therefrom. It is *any* sale or *any* removal, " knowingly " made, that is declared penal. That it is not limited to the act of the laborer and employer in selling or removing, but is applicable to all persons, is evident from the use of the word " knowingly." The parties directly interested in the product would, of course, always know of the existence of the lien ; and the requirement that its existence must be known to the party removing or selling is evidently intended for the protection of innocent third persons ; but if third persons know of the lien, the penalty applies to them. That it is not a sale upon, or a removal from, the premises alone that is prohibited,

is manifest from a consideration of the fact that all sales
of cotton, or nearly all, are made after removal from the
premises, and hence there would be none, or nearly none,
which could be reached ; and, inasmuch as no removal defeats
the lien so long as the product remains in the State, we must
conclude that it was intended as well to prohibit a removal
from the State as one from the premises. The object of the
statute being to keep the products subject to the lien, it would
be strange indeed if it prohibited only a removal which did
not affect the lien, and permitted one that defeated it.

I think it manifest that any sale, wherever made, and any
removal, whether to a point within or beyond the State, is
made penal by this statute, provided the party selling or
removing had notice of the unsatisfied lien. By this statute,
however, no lien is given except to the laborer for wages,
and to the employer for supplies furnished ; but, by the act
of 1873 ( Sess. Acts, p. 79), all the provisions of the act
of 1872 were extended and made applicable to croppers on
the shares, and " to the interest, or share of the crop, of the
landlord, for the rent of the land on which such crop may be
raised ; " and any removal of the crop from the premises,
before a division of the crop in kind has been had, is made
penal.

The specific penalty denounced by this statute is confined
to a removal from the premises, but this statute is declared to
be only amendatory of the act of 1872, all the provisions
of which are in express terms extended for the protection
of the new lien created by the new act, and one of those
provisions, as we have seen, makes any sale or removal what-
ever a penal offence. The two acts are to be construed
together ; and, manifestly, it was not intended that the pro-
tection under the second act, where there was a cropping on
the shares, should be less effectual than under the first, where
the simple relation of laborer and employer existed. It was
rather intended to be more effectual ; and, therefore, where
the crop was raised on the shares, in addition to the old

prohibition of a sale or removal generally, it was provided that the product might, if any of the parties interested so desired, be kept on the premises until there was an actual division in kind.

It could not have been intended that, if one of the parties defeated this scheme by clandestinely removing the cotton, the liability of one who thereafter knowingly sold or removed it should be less under the amendatory act than it would have been under the original one.

I conclude, therefore, that Westmoreland committed a penal act in sending the cotton out of the State after he knew of the landlord's unsatisfied lien, and was further advised that the landlord was looking for the cotton with a view of subjecting it to his demand. It will not be disputed that he who does an act prohibited by law, whereby direct pecuniary loss is inflicted upon another, is answerable to that other for the damage sustained; nor will it make any difference that the prohibited act is, by common or statute law, an indictable offence, and criminally punishable as such. The punishment is inflicted for the wrong done to the Commonwealth; the pecuniary liability is for the redress of the particular individual who is injured. Ordinarily, under statutes prescribing a pecuniary penalty payable to the party aggrieved, no recovery can be had except to the amount and in the special form indicated; but where the penalty is recoverable by a common informer, it is held that this does not preclude a recovery in a special action on the case by the particular person specially injured. In such case, it is said that, " as far as the public wrong is concerned, there is no remedy beyond that prescribed by act of Parliament. There is, however, beyond the public wrong, a special and particular damage sustained by reason of the breach of duty by the defendant, for which he (the plaintiff) has no remedy, unless the action on the case at his suit be maintainable." *Couch* v. *Steel*, 3 El. & Bl. (Queen's Bench) 402.

Where an act is prohibited or made punishable as a crime,

and no money penalty is prescribed for the benefit either of a common informer or of the person aggrieved, and no particular remedy is indicated for the redress of the private injury, an action on the case is always maintainable at the suit of him whose legal rights have been impaired by the act; and to this rule I know of no exceptions. Com. Dig., tit. "Action upon Statutes," F; *Ashby* v. *White*, Ld. Raym. 938; *s. c.*, Smith's Ld. Cas. 425, side p. 342, pt. 1; Hill. on Torts, 101, 102; 2 Rob. Pr. 547, 548; *Mayor* v. *Simpson*, 8 Ad. & E. 65; 55 Eng. Com. Law, 65; *Couch* v. *Steel*, 3 El. & Bl., *supra;* 1 Add. on Torts, 50; *Harrison* v. *Berkley*, 1 Strobh. 525; *Hays* v. *Porter*, 9 Shep. 371; *Troy* v. *Cheshire*, 3 Fost. 83; *Chamberlain* v. *Chester*, 1 Exch. 877; *Stetson* v. *Faxon*, 19 Pick. 147.

In the case of *Mayor of Lyme Regis* v. *Henley*, 1 Bing. 222 (27 Eng. Com. Law, 366), Parke, J., speaking for all the judges, in response to questions propounded by the House of Lords, said: " It is clear and undoubted law, that whenever an indictment lies for non-repair, an action on the case will lie at the suit of a party sustaining any peculiar damage." · The action was for special damage sustained by the plaintiff, by reason of the failure of defendants to make certain erections which they were by law bound to make, and the tests applied to determine whether an action on the case was maintainable were, whether defendants had been guilty of an indictable offence, and whether the plaintiff had sustained any peculiar damage in addition to that inflicted upon the community at large. These questions being determined in the affirmative, the action was maintained.

But, independently of the question whether Westmoreland was guilty of an indictable offence in sending the cotton out of the State, I think it clear that he is civilly liable for the wrongful act, the tort, committed in so doing. If Wooten (the landlord) had owned either a possessory right or a property right in the cotton, this proposition would not be disputed, and in such case he might have maintained *assumpsit*,

trover, detinue, or trespass for the value of the product, or the damage sustained by its abstraction.

Is he deprived of all remedy because he simply had a lien upon it; that is to say, neither a right to it, nor in it, but a right to subject it to the debt due him? It is the boast of the common law, — as of all other systems, I presume, — that there is no right for which it fails to afford an adequate remedy; and the special action on the case owes its origin to the fact that the progress of time and the development of an advancing civilization demonstrated the inadequacy of the old common-law writs to the new and varied relations of human affairs.

It may be asserted as a general proposition, that whenever a clear legal right has been violated, and damage sustained by the wrongful act of another, and the peculiar circumstances of the case preclude the bringing of any other form of action, an action on the case will always lie. It was well said by the Supreme Court of Vermont, in *Griffin* v. *Farwell*, 20 Vt. 152, that the fact that a particular suit was novel and of first impression was no objection to sustaining it. "The action on the case is peculiarly adapted," say the court, "to the redress of injuries arising from any new relations in which the parties may be placed by the varying changes in society and business, whether arising from statutory provisions or otherwise." To the same effect are all the authorities.

The only question presented, therefore, is whether our statutes creating liens on agricultural products confer upon the lienors such legal rights as will support an action on the case against those who wilfully destroy or impair the value of the security.

It was held in *Dozier* v. *Lewis*, 27 Miss. 680, that a judgment-creditor could not maintain a bill in chancery against one who had carried out of the State property bound by the lien of the judgment; and probably the same rule would have been applied to a special action on the case.

If I am correct in the views announced in the first part of

this opinion, the decision would be otherwise since the adoption of sects. 2658 and 2659 of the Code of 1871, making it a penal offence to remove from the State property subject to a contract or judgment-lien. Even without such a statute, the point has been ruled otherwise elsewhere. Thus, in *Yates* v. *Joyce*, 11 Johns. 136, it was held that a judgment-creditor could maintain an action on the case against one who had pulled down a house and removed it from land bound by the lien of the judgment; and the decision was rested upon the old case of *Smith* v. *Tonstall*, 3 Carth. 13, Vin. Abr. 553, in which it was ruled that an action on the case was maintainable, at the suit of a judgment-creditor, against a defendant who, by fraudulently confessing a judgment in favor of another, had defeated a recovery under the plaintiff's judgment.

In *Adams* v. *Paige*, 7 Pick. 541, an action on the case was maintained against one who had colluded with a debtor in suffering a fraudulent judgment to be rendered, whereby the lien of an attachment which had been sued out by the plaintiff was defeated. Chief Justice Parker, in delivering the opinion of the court, admits the novelty of the action, but adopts the declaration of Blackstone (3 Bla. Comm. 123), that "whenever the common law gives a right or prohibits an injury, it also gives a remedy; and, therefore, whenever a new injury is done, a new method of remedy must be pursued."

In *Lamb* v. *Stone*, 11 Pick. 526, an action on the case was brought against one who had purchased the property of a failing debtor, and aided him in absconding from the State, whereby the plaintiff was alike prevented from reaching the property or taking the body of the debtor under a *capias ad satisfaciendum*. But the plaintiff had not recovered a judgment against the debtor, and therefore had acquired no lien; and upon this ground alone it was held that his action was not maintainable. It was declared that if the lien had existed the action would lie. The opinion is elaborate, and reviews with approval the cases cited above. However antagonistic the views announced in these cases are to the adjudication in *Dozier* v. *Lewis*, *supra*,

I do not find it necessary to dissent from or question the correctness of that case. The result there reached is placed distinctly upon the ground that the lien of a judgment binds no specific piece of property, but operates alike upon all that the debtor has and all that he may acquire. "It is a general, not a specific, lien." His property, say the court, "is no more subject as a trust-fund to the payment of the judgment, than it is to the payment of any other just debt of the defendant, not in judgment." I apprehend that the decision would have been different if the slaves which were run off had been specifically condemned by a decree in chancery to the satisfaction of a complainant's debt. Certain it is that a mortgagee may maintain an action on the case against one who has carried off the mortgaged property, or in any way so impaired its value that it no longer affords an adequate security. 1 Jones on Mort., sects. 695, 696 ; *Levy* v. *City of New York*, 3 Robt. 194 ; *Lane* v. *Hitchcock*, 14 Johns. 213 ; *Van Pelt* v. *McGraw*, 4 N. Y. 110 ; *Gardner* v. *Heartt*, 3 Denio, 232.

While our statutes do not impose upon agricultural products a technical mortgage, which is the creature of contract, and they, therefore, will not enable the lien-holder to maintain *assumpsit* or trover against one who has converted them ( *Westmoreland* v. *Wooten*, 51 Miss. 825), it is quite evident that the lien is something more than a judgment-lien, in that it possesses that very element of specific definiteness the absence of which in the judgment-lien defeated the remedy in *Dozier* v. *Lewis, supra*. The reciprocal liens of landlord and laborer, on the crop, come into existence with the product of the soil, may be said to grow with it, and adhere to it wherever it may be carried, and against all into whose possession it may come. The lien applies to no other property owned by either party, and is confined to the crop of the particular year in which the indebtedness originated. The remedy for its enforcement is strictly *in rem*, by a seizure of the product itself, and the summoning of all who have any interest in or claim upon it ; and the proceedings culminate in an order of sale, and a distribution of

the proceeds among the parties entitled to them. It lacks nothing of a mortgage except an investiture of the legal title, and this necessarily resides in some one of the parties protected by the statutes. How careful the law is to guard and defend the rights created by it, is seen both in the civil proceedings for their enforcement, and the criminal penalties denounced against those who interfere with their enjoyment.

To hold, in the face of these provisions, that he who wilfully, knowingly, and intentionally runs the crop out of the State, for his own gain, to the injury of the laborer or the landlord, is liable in no form of action whatever, and must be permitted to enjoy, unmolested, the fruits of his wrongful act, seems to me a most lame and impotent conclusion indeed.

Under the English statute of 8 Anne, c. 14, which, like sect. 852 of our Code, prohibits the removal of property from demised premises without leaving sufficient to pay the year's rent, it has always been held that the party who removed, in violation of the law, was liable in an action on the case at the suit of the landlord, although no penalty for the removal was declared, nor was there any express declaration of civil liability; nor did the landlord have any lien on the property, but enjoyed a mere right of priority of payment. *Henchell* v. *Gibson*, 2 Wils. 140; *Green* v. *Austin*, 3 Camp. 260; *Calvert* v. *Joliffe*, 2 Barn. & Adol. 418; *Lane* v. *Crockett*, 7 Price, 566.

The statutes of Alabama give a lien on the crops to the landlord for his rent, but the lien is not operative against a purchaser in good faith without notice. Under this statute it is held that an action on the case may be maintained against one who, having notice of an unsatisfied lien, receives and ships out of the State cotton grown on demised premises; and this, without regard to whether the shipper had any design of defeating the lien or not. It was said that whether the motive of the shipper was to injure the landlord, or to deprive him of his legal right, was not material. " By removing or converting the crop, with notice of the landlord's lien, he has done an unlawful act, injurious to the landlord, and must

answer for the damage his act produces." *Hussy* v. *Peebles*, 53 Ala. 432.

If this decision is right, — and I think it is, — it is conclusive of the case in hand ; since, under our statutes, a purchase in good faith does not cut off the lien.

Westmoreland bought without notice of the lien. He received instant notice of it, and of the fact that the landlord was seeking the cotton to subject it to his demand. By shipping it thereafter, he subjected himself, in my opinion, to liability for all the damage thereby inflicted on the landlord. Any other view, it seems to me, is alike subversive of the objects of the statutes creating the lien and punishing its impairment, and of the well-settled law imposing liability for torts committed to the injury of another.

The counsel for the plaintiff in error having suggested that there was error in the opinions of the judges composing the majority of the court by whom the judgment herein was rendered, the following supplemental opinion was delivered in response to such suggestion.

SIMRALL, C. J. :

On account of the great practical importance to the agricultural and mercantile interests, especially, of any construction which may be placed upon the acts of 1872 and 1873, I have deliberately reëxamined the judgment heretofore rendered, and the grounds of it.

The act of 1872 created the lien in favor of the laborer alone, and intended that it should be discharged before the " crops were removed." That purpose is particularly disclosed in the eleventh section (Pamph. Acts, 135), which imposes a penalty upon any person who shall *knowingly* sell or remove any agricultural product subject to the lien.

The act of 1873 extended the lien to the cropper on the shares, and the landlord, as expressed in the first section, " to secure to such person an equitable division of the same, [the

crops] so raised, before such crop, or any part thereof, shall be in any manner disposed of, or removed from the demised premises." As held in my previous opinion, the intent is to impress a lien on the products in mass, on the premises, when raised, in behalf of the laborer, cropper on the shares, and landlord; and that neither, nor an assignee of either, shall make such disposition or removal as would defeat or impair the lien in behalf of another.

The third section makes the disposition or removal, as set forth in the first section, a penal offence. The words are, if either be done " without the consent of such person, *before* the same shall be divided, or distributed, etc., * * * the offender shall be subject to the penalty denounced in the eleventh section of the act of 1872."

The principle deduced from these statutes, when this case was first in this court, was that a purchaser of the cotton was not liable for its value, to the landlord; that the remedy for him was, to pursue the cotton, and out of it, if to be had, enforce his lien.

On this writ of error we are asked to hold the purchaser responsible for the tort of violating the statute by a removal of the cotton from the place where grown, as forbidden in the eleventh section of the first act and the third section of the last act.

Case will only lie where a clear, well-defined legal right exists, by some invasion of which injury is inflicted, and the law affords no specific remedy. To prevent injustice, this form of action may be used. The statute gives a specific remedy against the products, and, in aid of the lien, makes a disposition or removal a misdemeanor. But neither is a crime, within the statute, unless done, as declared in the eleventh section of the act of 1872, "*knowingly*," which word characterizes a disposition or removal *from the premises* before a division shall be made.

The statutory proceeding against the products may be fruitless because of a fraudulent disposition or removal from the

premises ; and because injustice would be done the landlord, or other holder of the lien, if he could not sue the tenant and his coadjutors in such fraudulent removal, this action is maintainable.

But an innocent purchaser, who buys in open market, where cotton is the common subject of trade, is in nowise connected with the removal or disposition of the cotton from the place where grown. He is not guilty of the offence defined in the acts. It is the act which the statute makes a crime, which the law would redress in this civil action. If redress in such circumstances were denied, injustice would be done ; but to make the innocent purchaser liable would be a greater injustice.

To hold the buyer of cotton liable to the cropper, or landlord, or laborer, when offered for sale in the large, active, open markets, without notice of a secret lien upon it, would so embarrass the marketing of almost the only salable product of our soil, as to be exceedingly detrimental to both the agricultural and mercantile classes.

The landlord has all the remedies in the Code of 1871. He may distrain for rent, and follow the goods of his tenant for thirty days. By these acts of 1872 and 1873, his privileges are still further enlarged. He has a lien, without limit as to time, with a summary remedy to enforce it. He has the security of the terror of punishment threatened against the tenant or any one who disposes of, or removes, the crops before he is satisfied. And if all these fail, we have declared in this case that he may recover from the tenant, and his aiders and abettors who join with him in getting the crops off the premises to evade the rent.

It will not do to impede the regular transactions of commerce, and impose the impossible task on cotton-buyers in the cities and towns of inquiring into the history of every bale of cotton offered for sale, to avoid the risk of a tacit lien, or, failing to do so, redressing the landlord, by the payment of damages for the wrongful act of the tenant, or his assistant, in removing the cotton before the rent was paid.

I am entirely content with the views announced in my opinion heretofore announced.

CHALMERS, J. :

I adhere to the views expressed in my dissenting opinion, heretofore delivered.