BUSTON et al. v. PENNSYLVANIA R. CO.

(Circuit Court, E. D. Pennsylvania. June 5, 1902.)

No. 62.

1. CARRIERS OF GOODS—CONNECTING CARRIERS—DUTY TO FORWARD.

It is the duty of a connecting carrier to deliver goods shipped under a through bill of lading to the next carrier, and so to deliver them in good condition for shipment; and its duty is not discharged by tendering them when in an unfit condition, whether it arises from an injury received while in the carrier's hands, or from some unusual cause. Where, by reason of fire having several times broken out in a shipment of cotton while in possession of a railroad company, which gave reason to believe that it was more than usually combustible and dangerous, a steamship company, which was the next carrier under the bill of lading, refused to receive it when tendered, it became the duty of the railroad company to have it inspected and put in proper condition, although the cause of the fires was unknown; and it could not relieve itself from liability for its failure to do so by storing the cotton in a warehouse, subject to the owner's order.

2. SAME—DAMAGES FOR FAILURE TO FORWARD GOODS.

Where a connecting carrier, instead of delivering a shipment of cotton to the next carrier in line under the bill of lading, as it should have done, stored it in a warehouse, subject to the owner's order, the measure of its liability is the damage resulting to the owner from its failure to forward the cotton when it should have done so; and it cannot be held liable for the value of the cotton, as for a conversion.

At Law. On motion by defendant for judgment upon reserved point notwithstanding the verdict.

George Wharton Pepper and Richard C. Dale, for plaintiffs.
Frank P. Prichard and John G. Johnson, for defendant.

J. B. McPHERSON, District Judge. The question for decision in this case arises upon somewhat peculiar facts. They are as follows, substantially as stated in the brief of defendant's counsel:

On July 19, 1900, the New York, Philadelphia & Norfolk Railroad Company contracted with the agents of R. A. Lee & Co., of Charlotte,

N. C., for the transportation of 300 bales of cotton from Norfolk by rail to Philadelphia, and thence by steamer of the American Line, sailing on August 11, 1900, to Liverpool. Afterwards, before August 4th, the New York, Philadelphia & Norfolk Railroad Company issued its through bills of lading for the cotton, of which 50 bales were consigned to the order of H. B. Moses, Liverpool, and the remaining 250 bales were consigned to the order of R. A. Lee & Co., Liverpool, "to be carried to the port of Philadelphia, and thence by American Line to the port of Liverpool, * * * at the rate from Norfolk to Liverpool of 28 cents, U. S. gold currency, per 100 pounds, gross weight, and advance charges." Each bill of lading contained, inter alia, the following provisions:

"(11) No carrier shall be liable for delay, nor in any other respect than as warehousemen, while the said property awaits further conveyance; and in case the whole or any part of the property specified herein be prevented, by any cause, from going from said port in the first steamer of the ocean line above stated, leaving after the arrival of such property at said port, the carrier hereinunder then in possession is at liberty to forward such property by succeeding steamer of said line, or, if deemed necessary, by any other steamer.

"(12) This contract is executed and accomplished, and all liability hereunder terminates, on the delivery of the said property to the steamship, her master, agent, or servants, or to the steamship company, or on the steamship pier at the said port; and the inland freight charges shall be a first lien, due and payable by the steamship company."

The cotton reached Philadelphia in the original cars on or about August 7th. With this cotton were shipped other bales from J. E. Gilbert & Co., of Nashville, Tenn.; the total shipment being 11 car loads, all of which were to go forward on the same steamer, but under independent contracts. On August 7th a fire broke out in one of the cars containing the Gilbert cotton. This was promptly extinguished. On the following day another fire broke out in a car containing 50 bales of Lee & Co.'s cotton. This was also promptly extinguished. In each case the fire began at a point inside the car, and there is no evidence that it was communicated to the cotton through any cause for which the carriers are in any way responsible. Upon the occurrence of these fires the defendant notified the agents of the American Line of the facts. Afterwards the defendant tendered this cotton to the agents of the American Line upon a lighter at the side of the steamship which was to sail on August 11th, in time for the delivery of the entire lot before the sailing of the vessel. The agents of the American Line declined to receive it on the ground that it was dangerous. Upon the happening of each of these fires, the defendant promptly notified the agents of the original carrier upon the through bill of lading, and through them notice was sent to the original shippers. In the meantime Lee & Co. had drawn drafts upon the plaintiff for the value of the 300 bales, and had negotiated the drafts in New York, with the bills of lading attached. These drafts were accepted by the plaintiff in Liverpool before he had received notice of the fire, and have since been paid. The notice was received on August 12th.

Immediately after the sailing of the steamer on August 11th, the American Line took the position that, as the cotton had not been shipped upon the vessel specified in the bills of lading, its obligation

to forward was at an end. The defendant was anxious to get rid of the cotton, and, without authority from the shippers or from the plaintiff, applied to the American Line to learn upon what terms it would take the cotton on its next steamer. On August 27th the American Line, while still insisting that its former contract was at an end, offered to take the cotton upon a vessel sailing September 15th, if an examination should first be made by a competent expert, and he should report the bales safe to ship; half the cost of examination to be borne by the shippers. The defendant immediately notified the shippers of this proposition. It was accepted on behalf of Gilbert & Co., but Lee & Co. declined the proposition. Before the defendant received Gilbert & Co.'s acceptance, a third fire occurred in their cotton. Thereupon the American Line notified the defendant on September 6th that it would not receive any of the cotton under any circumstances. Defendant sent prompt notice of this refusal to Lee & Co., and requested them to take steps to dispose of the property. They refused on September 15th to have anything to do with it; asserting that they had sold their drafts, with bills of lading attached, and had therefore ceased to have any interest. In August, Kingman M. Putnam, representing the underwriters, and acting also for Gilbert & Co., came to Philadelphia, examined the cotton, and finally took charge of the Gilbert shipment. He had no authority to act, and did not act, for the plaintiff, or for Lee & Co. On September 18th the defendant had the Lee cotton removed to the warehouse of D'Olier & Co., who examined it, put it in proper condition for shipment, and reported on September 20th to the defendant, and also to Putnam, that it was in good condition for shipment. In the meantime the plaintiff came to the United States, reaching New York before September 20th. On or before that date he was fully advised of all the circumstances, and of the defendant's readiness to surrender the cotton to the owner, whoever he might be, on surrender of the bills of lading. He refused, however, and still refuses, to do anything with the property; asserting that he is under no obligation to receive it until its arrival at Liverpool.

Upon these facts, it seems to me that the position of the plaintiff is correct, and that the defendant was at fault for not having made a proper tender of the cotton to the American Steamship Company. It is agreed by both parties that when the cotton was offered to the vessel it was properly refused. At that time there was reasonable ground to suspect that the plaintiff's cotton was more than ordinarily combustible, and under such circumstances the steamship company was justified in declining the risk to life and property that seemed to be involved. Therefore the tender then made by the defendant was not such as to relieve it from the obligation that rests upon a connecting carrier. The character of this obligation is well settled, and has been thus described in Michigan Cent. R. Co. v. Mineral Springs Mfg. Co., 16 Wall., on page 324, 21 L. Ed. 297:

"In such cases it is the duty of the carrier, in the absence of any special contract, to carry safely to the end of his line, and to deliver to the next carrier in the route beyond. This rule of liability is adopted generally by the courts in this country, although in England, at the present time, and in some of the states of the Union, the disposition is to treat the obligation of the carrier who first receives the goods as continuing throughout the entire

route. It is unfortunate for the interests of commerce that there is any diversity of opinion on such a subject, especially in this country; but the rule that holds the carrier only liable to the extent of his own route, and for the safe storage and delivery to the next carrier, is in itself so just and reasonable that we do not hesitate to give it our sanction. Public policy, however, requires that the rule should be enforced, and will not allow the carrier to escape responsibility on storing the goods at the end of his route, without delivery or an attempt to deliver to the connecting carrier. If there be a necessity for storage, it will be considered a mere accessory to the transportation, and not as changing the nature of the bailment."

A connecting carrier's obligation cannot be discharged by offering to deliver goods to the succeeding carrier when they are not in fit condition for shipment (6 Am. & Eng. Enc. Law [2d Ed.] 609, and cases cited); and the situation, to my mind, is precisely the same whether they have become unfit for further carriage because of injuries suffered in the hands of the connecting carrier, or because of some unusual circumstances, such as existed in the present case. If, for either of these reasons, the succeeding carrier is not bound to receive the goods, it must follow that the so-called tender does not relieve the connecting carrier from his obligation to forward. This remains, and can only be discharged by delivery, or by an offer to deliver, to the succeeding carrier, after the goods have been put into proper condition to be carried farther. This being so, it seems to follow irresistibly that after the cotton in controversy had been inspected, and had been discovered to be free from unusual danger, and had been properly prepared to go forward by vessel, the defendant was bound to tender it again to the steamship company. It would have then been the duty of the latter company to receive it, unless the bill of lading, which provided that the cotton should be forwarded by steamship to sail on August 11th, relieved them from obligation to accept it after that date. This, however, would have been a defense for the steamship company to set up, and thereafter the controversy would have been between that company and the plaintiff. As the matter now stands, the steamship company is under no obligation to the plaintiff, because the cotton has never been properly offered for carriage; and the consequence is that, if the defendant is not responsible for such damage as the plaintiff may have suffered by the delay in forwarding, no one at all is responsible, and the anomalous situation would be presented, that, after goods have been delivered to a carrier to be transported upon a through line to a port of destination, a point of time has been found when no one is responsible as a common carrier for the safety of the goods. Ordinarily this, I think, would be contrary to the well-settled rule that governs transportation of goods by a through line: Michigan Cent. R. Co. v. Mineral Springs Mfg. Co., supra.

But although I am of opinion that the plaintiff is entitled to recover, I cannot agree to the measure of damages that was provisionally allowed to prevail at the trial. The verdict of the jury is made up of two sums; the first being $12,457.91, the market price of the cotton at the port of Liverpool at the time when, in ordinary course, delivery would have been made to the plaintiff; and the second being $2,304.34,—the amount of profits that the plaintiff would have made upon contracts into which he had entered in reliance upon the receipt of this cotton.

It seems to me, upon further reflection, that the plaintiff is entitled to recover the second of these sums only. The defendant has not converted the plaintiff's cotton to its own use. It asserts no ownership over the property, and has done nothing with it except to care for it during this interval. Except for the failure to fulfill its obligation to forward, the defendant has done everything that could be required of it. The cotton is safely stored, and has always been at the plaintiff's command and subject to his order. I see no ground, therefore, upon which the defendant can be subjected to damages as if it had wrongfully converted the plaintiff's property, and were being sued in trover. If, therefore, the plaintiff enters a remittitur of so much of the verdict as exceeds the sum of $2,304.34, judgment may be entered upon the verdict for that amount. When this is done, an exception to the entry of such judgment will be granted both to the plaintiff and the defendant. If the remittitur is not entered on or before July 1st, the clerk will enter an order that a new trial is granted.

### Corrected Order.

Since the foregoing opinion was filed, counsel have called my attention to a mistake into which I inadvertently fell by relying too much upon the pleadings. The plaintiff's declaration asks for profits as part of the damages, and I was under the impression that evidence upon this subject had been given at the trial. The notes of testimony show, however, that the only evidence offered by the plaintiff on the question of damages was the market price of cotton at Liverpool, and that nothing was proved concerning the loss of profits. The plaintiff, therefore, in my opinion, has failed to prove his case completely, and, while he has in theory a right to recover, must be denied a judgment because he has not furnished the court sufficient evidence to determine the amount of his loss.

Judgment must be entered for the defendant notwithstanding the verdict.