JOHN McCARTHY, Respondent, v. TERRE HAUTE AND IN-
DIANAPOLIS RAILROAD COMPANY, Appellant.

June 1, 1880.

1. In the absence of a special contract a common carrier is bound to transport and deliver goods marked to a certain destination beyond the end of its line, only according to the usage of its business, and is not liable for losses beyond its line.

2. The giving a through rate to the shipper by the carrier is not of itself evidence of a special contract to carry beyond the latter's line.

3. The receiving of goods for shipment to a point beyond its line, by a carrier having knowledge of an obstruction in transportation beyond its line, may not be a breach of its duty as a carrier.

APPEAL from the St. Louis Circuit Court, ADAMS, J.
Reversed and remanded.

E. W. PATTISON, for the appellant: In the absence of a special contract, the carrier is only liable for the carriage of the goods over his own route, and perhaps the safe storage and delivery to the next carrier. — Railroad Co. v. Manufacturing Co., 16 Wall. 318; Railroad Co. v. Pratt, 22 Wall. 123; Darling v. Railroad Co., 11 Allen, 295; Burroughs v. Railroad Co., 100 Mass. 26; Babcock v. Railroad Co., 49 N. Y. 491; Brintnall v. Railroad Co., 32 Vt. 673; Railroad Co. v. Forsyth, 61 Pa. St. 81; Coates v. Express Co., 45 Mo. 238.   The giving of a through rate will not bind the carrier to carry beyond its line. — Hoagland v. Railroad Co., 39 Mo. 451.

T. J. ROWE, for the respondent: A carrier who receives goods for transportation, when it has knowledge of the existence of some impediment to transportation, is liable to the shipper for any damage that results from that impediment.

The reception for transportation of respondent's cattle under all the circumstances of this case was such negligence on the part of appellant as to render it liable for damages sustained thereby.— *Clark* v. *Pacific R. Co.*, 39 Mo. 191; *Wolf* v. *Express Co.*, 42 Mo. 426; *Levering* v. *Insurance Co.*, 42 Mo. 92; *Pruitt* v. *Railroad Co.*, 62 Mo. 528; *Tucker* v. *Pacific R. Co.*, 50 Mo. 385; *Tuggle* v. *Railroad Co.*, 62 Mo. 427. The measure of damage is the difference between market value on day of arrival and the day they should have arrived, and the shrinkage and the additional expenses occasioned by the delay. — *Sturgeon* v. *Railroad Co.*, 65 Mo. 573; *Tucker* v. *Pacific R. Co.*, 50 Mo. 385; *Faulkner* v. *Southern Pacific R. Co.*, 51 Mo. 311; *Smith* v. *Whitman*, 13 Mo. 352.

BAKEWELL, J., delivered the opinion of the court.

This is action against defendant, as a common carrier, for damages for delay in transporting freight.    It is alleged in the petition that plaintiff owned and operated a railroad from East St. Louis to Indianapolis, connecting there with the Pan-Handle Road, which connected at Pittsburg with the Pennsylvania Central; that defendant owned and ran upon their road, in connection with the two other roads, freight cars for carrying freight between East St. Louis and Philadelphia, and was a common carrier for hire between the last-named cities; that on July 20, 1877, at East St. Louis, plaintiff delivered to defendant one hundred and seventy-one sound cattle, worth $15,000, and in consideration of $1,300 agreed to be paid by plaintiff, defendant agreed to carry the same safely, and deliver them to plaintiff's agent at Philadelphia, within a reasonable time; that five days was a reasonable time, but that defendant so misbehaved and neglected its duty as carrier that they failed to deliver the same until seventeen days; that if defendant had used, as it was bound, ordinary care and diligence in forwarding and carrying the cattle, they would have arrived on July 25th; that, meanwhile, their market value had declined $20 per head; that plaintiff was, consequently, put to great expense

in feeding and caring for the cattle, by reason of all which he has been damaged $4,900. The answer of defendant, after a general denial, sets up a special defence that defendant carried the cattle to Indianapolis, the end of its route, on July 21st; that the Pan-Handle Road could not receive them because of the railroad strikes and riots of that year, the particulars of which are set out; that the rioters held, not only the Pan-Handle Road, but all roads by which Philadelphia could be reached, from July 21st to August 1st; that it was, therefore, impossible for defendant to forward the cattle till that date, and that they were then received by the Pan-Handle Road and at once forwarded to Philadelphia; and that if the price of cattle was higher in Philadelphia on July 25th than on the day of their arrival, this was owing to the scarcity of cattle caused by the strike. Plaintiff replies that defendant knew of the strike, of the condition of the road and of its connecting roads, as early as July 18th, and having such knowledge, received plaintiff's cattle for the purposes and on the agreement set out in the petition.

Respondent introduced testimony tending to show that he shipped the cattle on July 20, 1877, on appellant's road, of which the termini were East St. Louis and Indianapolis. On July 19th appellant refused to take them, alleging that there was a strike, which would soon be over. Respondent testified that appellant gave him through rates from East St. Louis to Philadelphia, and that he knew from this that appellant had connections with the Pennsylvania Central and Pan-Handle Roads. A bill of lading was delivered at the time of the shipment; this was attached to a draft by respondent, and forwarded to Philadelphia. There was testimony as to damages. There was no evidence that defendant was informed of the destination of the cattle, or knew to whom they were consigned, nor that plaintiff paid anything for the transportation of the stock, nor to whom he paid, or agreed to pay, the rate of transportation fixed. The evidence was that appellant's cars did not run to Philadelphia;

there was nothing to show any agreement between the connecting lines. Plaintiff sent one Fox from East St. Louis in charge of the cattle. They left East St. Louis on the afternoon of July 20th, and reached Indianapolis at noon, next day. When they reached Indianapolis they were taken by defendant to the stock-yards of the Pan-Handle Road, and found a dispatch from the officers of that road, that no cattle would be received in the yards except at owner's risk. Fox then telegraphed from Indianapolis to the general freight agent of the Pan Handle Road, asking him if they would take the cattle through, and received a reply that they would not. They were kept in the yards of the Pan-Handle Road until the roads were open for traffic, when they were at once sent forward.

At the close of plaintiff's case, an instruction in the nature of a demurrer to the evidence was refused.

Defendant introduced evidence tending to show that it made every effort to forward the cattle from Indianapolis to Philadelphia, and that it was impossible to send them east of Indianapolis before August 1st, on account of the strike and riot along the lines in Indiana, Ohio, and Pennsylvania. The trouble began in Pittsburg on July 19th, but was not believed to be very serious until late in the day on the 21st. On July 20th, no apprehension was felt in St. Louis of serious, long-continued interruption of traffic. The rioting began at Indianapolis on July 23d. Everything that was humanly possible seems to have been done, both in Pittsburg and Indianapolis, to move the trains.

At the instance of plaintiff, the court instructed the jury:

1. That if they believe from the evidence that the defendant, on the twentieth day of July, 1877, received from the plaintiff, at East St. Louis, one hundred and seventy-one cattle, for the purpose of carrying and forwarding them from East St. Louis to Philadelphia; that it was the duty of the defendant to transport said cattle in the usual and ordinary time required by its trains, or those of its connecting lines, if it could be done by the exercise of ordinary care and dili-

gence ; and that if plaintiff's cattle were damaged by any unreasonable delay caused by the negligence of defendant, taking into consideration the distance to be travelled, and the usual and ordinary modes of transportation in such cases, then the jury will find for the plaintiff.

2. Though they may believe from the evidence that defendant was prevented from carrying and forwarding the cattle to plaintiff's consignee at Philadelphia within a reasonable time after the receipt of them by defendant, on account of the lawless violence of an armed mob that obstructed transportation along the line of the defendant and its connecting lines, yet they will find for the plaintiff if they believe that plaintiff sustained loss directly brought about by reason of the negligence and want of proper care and foresight of the defendant and its agents and servants.

3. If the jury believe from the evidence that defendant, or its agents or servants, knew of the existence of an armed mob at any point or points along its line of railroad, or that of its connecting lines, between East St. Louis and Philadelphia, and they had reason to believe that said armed mob would obstruct transportation along its line and its said connecting roads at the time or before it received plaintiff's cattle, and that, notwithstanding said knowledge, it received plaintiff's cattle for transportation to Philadelphia, and proceeded with them in the face of any impending danger, the defence that defendant was prevented from carrying and forwarding said cattle from East St. Louis to Philadelphia in the usual and ordinary time, on account of the acts and the existence of such armed mob, can be of no avail.

The court of its own motion gave the following instructions : —

1. If, in the light of all the instructions given them, the jury find for the plaintiff on the ground that there was an unreasonable delay in the transportation of plaintiff's cattle, they will give him a verdict for such sum, not to exceed $4,900, as they may believe from the evidence he is entitled to, taking into consideration the difference between the

market value of said cattle on the day they arrived in Phila-
delphia and the day they should have arrived, the depre-
ciation and loss of flesh and weight occasioned to said cattle
by reason of said delay, and the additional sum or sums of
money that plaintiff was compelled to expend to supply said
cattle with necessary food and care, if unreasonably delayed,
and during such delay on the trip.   But the court further
instructs the jury that if, from all the facts and circum-
stances before you in the case, you find that there was no
unreasonable delay in the transportation of plaintiff's cattle,
and further find, in the light of all the instructions given you,
that at or before the time the defendant received plaintiff's
cattle for transportation, the defendant, its agents, or ser-
vants, knew of the existence of an armed mob at any point
or points along its line of railroad, or that of its connecting
lines, between East St. Louis and Philadelphia, and had rea-
son to believe that said armed mob would obstruct trans-
portation along said line or lines, and that notwithstanding
said knowledge the defendant received said cattle for trans-
portation to Philadelphia, and proceeded with them for their
place of destination, but that said cattle were delayed on the
route by reason of an armed mob which prevented continu-
ous progress, then plaintiff's measure of damages will be
the loss sustained by plaintiff by reason of the depreciation
in value and loss of flesh and weight, if any, occasioned to
said cattle by reason of said delays, and the additional sum
or sums of money that plaintiff was compelled to expend to
supply said cattle with necessary food and care during such
delays.

The jury, at the instance of appellant, were instructed as
follows : —

1. If the jury believe from the evidence that on and after
the twenty-first day of July, 1877, the railroad tracks, depots,
and rolling-stock of the Pan-Handle and Pennsylvania Roads
at Pittsburg were taken forcible possession of by bodies of
armed men, outside of its own employees ; that said men
were at that time burning and destroying the tracks and

property of said roads at Pittsburg; that they continued to hold possession of said roads by force of arms for several days, then the Pan-Handle Road was justified in refusing to receive the cattle at Indianapolis.

2. If the jury believe from the evidence that the Pan-Handle Road and the Pennsylvania Road had sufficient men in their employ to handle and run its freight trains without interruption, had they not been prevented by the forcible interference of men who were not at that time in the employ of either of said roads, they will find for the defendant, even though they may also believe from the evidence that the bands of men who obstructed the roads and hindered the running of trains thereon were composed in part of those who had been discharged from the employment of said roads or either of them.

3. If the jury believe from the evidence that on and after the twenty-first day of July, 1877, the railroads leading east from Indianapolis were in the possession of bodies of armed men outside of their own employees; that said bodies of men took forcible possession of said roads and forcibly prevented the movement of freight trains over said roads; and that defendant made all efforts in its power to forward the cattle sued for to Philadelphia, and did forward them as soon as possible after the companies operating said roads had regained possession and control of the same, then they will find for the defendant, even though such bodies of men may have been composed in part of former employees of such roads or any of them.

4. The jury are instructed that defendant is liable only for the safe carriage of the cattle to Indianapolis, and their delivery there to the next carrier, unless plaintiff has shown an agreement on defendant's part to carry them beyond that point. If, therefore, the jury believe from the evidence that defendant carried the cattle safely to Indianapolis, and there delivered them to the next railroad as soon as such railroad would receive them, they will find for the defendant, unless

they believe from the evidence that defendant agreed to carry them to Philadelphia; and the burden of proof is on plaintiff to show such an agreement.

Amongst other instructions asked by appellant and refused, were the following: —

1. If the jury believe from the evidence that the cattle were delivered at Philadelphia at as early a day as was possible under all the circumstances in the case, they will find for the defendant.

2. Even though the jury should believe from the evidence that when defendant received the cattle at East St. Louis it knew that it would be impossible to get said cattle through to Philadelphia without delay, yet, if the jury further believe from the evidence that said cattle could not have been carried to Philadelphia by any other route any sooner than they were actually carried there, then defendant is not liable by reason of having taken said cattle with such knowledge.

3. The jury are instructed that even though they may believe from the evidence that at the time defendant received the cattle sued for, the agents of defendants knew that there was a strike on the Pan-Handle and Pennsylvania Roads, they were nevertheless bound to receive the cattle, and they are not liable in this action if they forwarded the cattle from Indianapolis as soon as any road running east from that place would receive them.

There was a verdict and judgment for plaintiff.

The rule very generally adopted in this country, and by the Supreme Court of the United States, is that in the absence of a special contract it is the duty of a carrier receiving goods destined to a point beyond his line, to carry safely to the end of his line, and to deliver the goods to the next carrier on the route beyond. This is sometimes called the American, as distinguished from the English rule, which is, that the first carrier is liable as carrier, and is exclusively liable to the end of the route, though the goods are carried to their destination over connecting lines in which the first

carrier is not interested.   The English rule as to the liability of the first carrier is followed in Georgia, Tennessee, Florida, New Hampshire, Iowa, and Illinois.   In Missouri, and generally in the other States, it is held that where a carrier receives goods marked to a particular destination beyond the end of his road, he is bound to transport and deliver them according to the usage of his business, and is not liable for losses beyond his line, in the absence of a special contract. *Railroad Co. v. Manufacturing Co.*, 16 Wall. 324; *Burroughs v. Railroad Co.*, 100 Mass. 26; *Railroad Co. v. Forsyth*, 61 Pa. St. 81 ; *Babcock v. Railroad Co.*, 49 N. Y. 491; *Brintnall v. Railroad Co.*, 32 Vt. 665 ; 84 Ill. 239 ; 36 Iowa, 181; *Coates v. Express Co.*, 45 Mo. 238.   It is not anywhere questioned that the carrier may by express contract bind himself to carry to any destination, whether beyond the end of his line or not, and the giving of a through bill of lading or receipt, the fact that the first carrier held himself out as a carrier for the whole route, or that it has a contract with the connecting lines such as would create a joint liability, or that it was the custom of the carrier to carry to the destination of the goods, are circumstances to be left to the jury, as tending to show such a contract.

In the present case no such facts appear ; the bill of lading was not in evidence, nor were its contents shown.   What would have been evidence to support a verdict on the theory of responsibility as carrier to the end of the route, by virtue of special contract, we need not examine ; as, though the petition alleges a liability as common carrier, the case does not seem to have been tried on that theory.   We see no evidence in the case from which a fair inference of a contract to carry beyond Indianapolis can be drawn.   The mere giving of a through rate to the shipper is not enough.   *Hoagland v. Railroad Co.*, 39 Mo. 451.   As to the usages of the business of the carrier, plaintiff was familiar with them.   He had been shipping cattle east over defendant's road for five years, and he had notice of the fact that the cars of defendant never ran through on other lines unless there was a special

agreement with the shipper to that effect. We do not see what defendant could have done, under the circumstances, that it was bound to do, in discharge of its duties as a common carrier, and did not do. It transported the cattle to Indianapolis and turned them over there to the Pan-Handle Road at its stock-yards with all convenient dispatch. We think the demurrer to the evidence should have been sustained.

The instructions which put the case to the jury on the theory that defendant proceeded with the goods in the face of an impending danger do not seem warranted by any evidence in the case. The goods were kept at Indianapolis until the danger was past, and moved from there as soon as they could be moved. On the 20th there was no obstruction of defendant's line ; on the 23d it seems for the first time to have become clear that the insurrection in Pittsburg was of so serious a character that goods could not be safely moved for some time. We see no evidence that defendant was guilty of any breach of its duty to plaintiff in accepting the goods for transport on the 20th. The goods could in no case have reached Pittsburg before the collision between the soldiers and the mob, and the burning of the tracks on the 23d. The cattle must have been delayed somewhere, and it does not appear why the delay might not as well be at the Indianapolis stock-yards as at East St. Louis. If defendant knew of the obstruction before receiving the cattle, and that the Pan-Handle Road could not receive them, then there might be a continuing liability as carrier until they were received by that road, according to the ruling of the Supreme Court of the United States in *Railroad Company* v. *Manufacturing Company, supra*. But neither the pleadings nor the instructions put the case upon the theory of a damage occurring in consequence of a failure to deliver to the next carrier at Indianapolis and an injury to the goods whilst in defendant's hands awaiting delivery to the second carrier.

The judgment is reversed and the cause remanded. Judge Hayden concurs ; Judge Lewis did not sit.