LITTLE ROCK PACKING CO. v. CHICAGO, B. & Q. R. CO. (KANSAS CITY STOCK YARDS CO. OF MAINE et al., third-party defendants).

NEUHOFF BROS. PACKERS v. CHICAGO, B. & Q. R. CO. (KANSAS CITY STOCK YARDS CO. OF MAINE et al., third-party defendants).

EBNER BROS. PACKERS v. CHICAGO, B. & Q. R. CO. (KANSAS CITY STOCK YARDS CO. OF MAINE et al., third-party defendants).

Nos. 7204, 7205, 7872.

United States District Court,
W. D. Missouri, W. D.

Oct. 23, 1953.

Lyne, Wendover & Blanchette, and Fritz Lyne, Dallas, Tex., Gage, Hillix, Moore & Park, and John Kreamer, Kansas City, Mo., for plaintiff, Little Rock Packing Co. and Neuhoff Bros., Packers.

Charles F. Lamkin, Jr., Kansas City, Mo., for plaintiff, Ebner Bros., Packers.

Eldon Martin, Chicago, Ill., Lathrop, Crane, Sawyer, Woodson & Righter, Sam D. Parker and Carl E. Enggas, Kansas City, Mo., for defendant, Chicago, B. & Q. R. Co.

Langworthy, Matz & Linde, Kansas City, Mo., for third-party plaintiff, Chicago, B. & Q. R. Co., a corp.:

Roscoe C. Van Valkenburgh, Kansas City, Mo., for third-party defendants, Kansas City Stock Yards Co. of Maine, and Kansas City Connecting R. Co.

RIDGE, District Judge.

The above-entitled actions were consolidated for trial and are presently before the Court for decision on the merits.

Plaintiffs herein individually seek recovery for a substantial number of cattle which were lost during the Kansas City flood of July 13, 1951, allegedly due to defendant's negligence. Defendant, though denying liability, brings a third-party proceeding, seeking indemnity against the third-party defendants, the Kansas City Stock Yards Company and the Kansas City Connecting Railroad, for any and all damages which might be assessed against it, if recovery is allowed on the primary claims.

Federal jurisdiction is based on both diversity of citizenship and on 49 U.S. C.A. § 20(11). Plaintiffs Neuhoff Bros., Packers (hereinafter referred to as "Neuhoff") and Ebner Bros. Packers (hereinafter referred to as "Ebner") are both Texas corporations, with principal places of business in Dallas, Texas, and Wichita Falls, Texas, respectively; plaintiff Little Rock Packing Company (hereinafter referred to as "Little Rock") is an Arkansas corporation, with its principal place of business in Little Rock, Arkansas. All are engaged in the meat packing industry and, concomitantly, in the purchase of livestock. Defendant, Chicago, Burlington & Quincy Railroad Company, is an Illinois corporation, with its principal office in Chicago, Illinois. The amount in controversy is in excess of $3,000.

Findings of Fact.

On July 11, 1951, E. N. Grueskin & Co., cattle order buyers at Sioux City, Iowa, purchased 113 head of cattle (valued at $33,651.16) to be shipped on consignment to Neuhoff at Dallas, Texas; 32 head of cattle (valued at $8,037.24) were purchased for Little Rock, to be shipped on consignment to Little Rock, Arkansas. In Sioux City, on the same date, one Doyle E. Potts (connected with W. W. Gary and Company, cattle and hog buyers) purchased 28 head of cattle (valued at $10,259.22) for Ebner, said cattle to be shipped on consignment to Wichita Falls, Texas.

Shortly after the purchase of the Neuhoff and Little Rock cattle, Mr. Harold Grueskin, a partner in E. N. Grueskin & Co., billed the cattle in question for shipment from Sioux City over the Chicago Northwestern Railroad to Kansas City, Missouri, with the Missouri Pacific Railroad as connecting carrier to Dallas, Texas, and the Missouri Pacific and the M. K. & T. railroads as connecting carriers to Little Rock, Arkansas. These billings were filed with the Chicago Northwestern Railroad agent at Sioux

City, early in the afternoon on July 11, 1951. Within an hour thereafter, the Chicago Northwestern received word that its connecting carrier the Missouri Pacific Railroad could not accept the cattle due to floods south of Kansas City. It then notified Grueskin that it would not accept the cattle for shipment from Sioux City.

Immediately following the rejection by the Chicago Northwestern, Grueskin contacted Mr. A. Dirksen, livestock clerk for the defendant herein, the Chicago, Burlington & Quincy Railroad. Grueskin explained why the Chicago Northwestern had refused the shipment, and then asked if Burlington could accept the cattle. Although Dirksen, himself, had authority to accept the cattle, he thought it advisable to first check with his superiors. After being informed by his superiors that the cattle would be accepted for shipment, in spite of flood conditions, Dirksen immediately notified Grueskin, informing him that the cattle would go through "on schedule". The billings were then delivered to Burlington. The Neuhoff cattle were routed Burlington to Kansas City, and M. K. & T. from Kansas City to Dallas. The Little Rock cattle were routed Burlington to Kansas City, Kansas City Southern Railroad from Kansas City to Howe, Oklahoma, and Rock Island Railroad from Howe to Little Rock, Arkansas. Uniform Livestock Contracts (admittedly binding on the parties) were executed to this effect. At approximately this same time, defendant Burlington also contracted to ship the Ebner cattle, via Kansas City, to Wichita Falls, Texas, with the St. Louis-San Francisco Railroad as connecting carrier. Prior to this arrangement with defendant, Mr. Potts had first tried, as had Mr. Grueskin, to arrange shipment with the Chicago Northwestern, which turned down the Ebner cattle for the same reason it had turned down the Neuhoff and Little Rock shipments. The above fruitless negotiations with Chicago Northwestern were fully brought to Burlington's attention at the time it agreed to accept all the shipments involved.

Although the cattle were scheduled to leave Sioux City, Iowa, at 8:30 p. m., July 11, 1951, on Burlington's train No. 85-78, said train was delayed in departing for almost three hours, not leaving until 11:20 p. m., July 11th. After intermediate stops and delays, e. g., Lincoln, Nebraska, and St. Joseph, Missouri, Burlington train No. 85-78, on which the cattle were loaded, arrived in North Kansas City, Missouri, at 10:00 p. m., on July 12th, seven hours behind schedule. The cars containing all the plaintiffs' cattle were brought to the Kansas City Stock Yards four hours thereafter, at 2:00 a. m., July 13th, and unloaded for watering and feeding; the unloading was completed by 3:30 a. m., ninety minutes later. From that time forward, the cattle were under the care of third-party defendant, Kansas City Stock Yards Company. A complete schedule from the hour the cattle were delivered to the chute of the Sioux City Stock Yards, at 4:55 p. m., July 11th, until the time they were actually unloaded in Kansas City in the early hours of the morning, July 13th, will be found in Stipulations 28 and 29, signed by the parties herein.

The above facts acquire significance only in light of the conditions and circumstances existing during that fateful period from July 11th to July 16th, when the waters of the Kansas River rose in their fury to finally overflow, on July 13th, the levees protecting the Stock Yards and Central Industrial District of Kansas City, Missouri.

At the time defendant accepted plaintiffs' cattle for shipment, all parties thereto had knowledge of the threatening flood conditions existing in the Kansas River Valley and around the Kansas City area. As early as June 10, 1951, flood conditions existed in the Kansas River water-shed. Early on the morning of July 11th, more than four hours before defendant agreed to ship plaintiffs' cattle (and more than eleven hours before said cattle were scheduled to leave

Sioux City) the Interstate Commerce Commission issued King's I. C. C. Order No. 52, authorizing all railroads serving Kansas, Missouri, Illinois and Kentucky, to reroute traffic over any available route because of "catastrophic" floods and high water in that area, regardless of any routing indicated on the shipping way-bills. In that connection, there is testimony to the effect that defendant contacted Wilson & Co., of Kansas City, which had eight carloads of cattle on the same train with plaintiffs', destined to points in Alabama, Georgia and Tennessee, requesting permission to divert shipments at St. Joseph, Missouri. Notwithstanding the permission so granted, such cattle were not diverted by the defendant, but were transported to Kansas City and unloaded with the shipments presently considered.

During the night of July 11th, and early the following morning, while plaintiffs' cattle were but a few hours out of Sioux City, the Kansas River breached its levees fifty miles away from Kansas City, at Lawrence, Kansas, there causing more than $3,000,000 of damage. Because of flood conditions south of Kansas City, and when the cattle in question were only a few minutes out of Lincoln, Nebraska, defendant was notified (10:05 a. m., July 12th) by the M. K. & T. Railroad, the connecting carrier for the Neuhoff cattle, that it could not accept further cattle shipments out of Kansas City. Regardless, defendant did not alter the routing of said shipment.

At 10:00 p. m., July 12th, plaintiffs' cattle arrived at Murray Yards of defendant in North Kansas City, and were placed in the Stock Yards in the Central Industrial District four hours later, at 2:00 a. m., July 13th. At 4:10 a. m., July 13th, the Kansas City Southern Railroad, connecting carrier for the Little Rock cattle, sent a train out of Kansas City with ninety-four empty cars. Apparently no attempt was made to place the Little Rock cattle, which had arrived at Murray Yard, North Kansas City, some six hours earlier, on that departing Kansas City Southern train. Two other Kansas City Southern trains departed Kansas City after the scheduled arrival of Burlington's train No. 85–78 (but before its actual arrival), with a number of empty cars. None of these Kansas City Southern trains handled livestock for the connection at Howe, Oklahoma.

At 10:25 a. m., July 13th, the Kansas City Southern also ran a train from Kansas City, with four empty cars. This was more than six hours after plaintiffs' cattle had been unloaded at the Stock Yards. (This train, however, was later stopped at Amsterdam, Missouri, south of Kansas City, because of flood waters of the Marais des Cygnes River.)

At 10:30 a. m., July 13th, in spite of previous assurances to the contrary by the Corps of Army Engineers, and the Weather Bureau, the Kansas River with a wall of water overtopped the levees protecting the Kansas City Central Industrial District, and flooded it to a depth of fifteen to twenty feet. As stated in the pre-trial order of October 23, 1952, there is no question that this devastating deluge was an Act of God.

Before the water first topped the levees aforementioned, the Central Industrial District, including the Stock Yards where plaintiffs' cattle were then penned, was ordered by civil authority to be evacuated. However, before such order was given, the Kansas City Stock Yards Company drove all the cattle in question to the second and third floors of its Hog Barn, which, though above the subsequent flood-water level, was open to the sun at the third story. There, plaintiffs' cattle remained mingled with 5,000 head of cattle until shortly after noon on Monday, July 16, 1951. During the period of this confinement, with daily temperatures ranging as high as 96°, the cattle had only hay for feed, which was delivered by the Kansas City Stock Yards Company, and no water at all. When finally, on July 16th, plaintiffs' cattle, and the other livestock could be reached, many had already died of heat exhaustion. The remainder were routed down ramps, and driven through a quarter of

a mile of flood water to the 23rd Street Viaduct, where they were loaded on trucks and taken to the Missouri Pacific Feed Lots at Prospect, Missouri. A number of the cattle which had survived confinement in the Hog Barn, died en route to Prospect, and still others died at Prospect.

From the time the cattle were in the Stock Yards to the time the survivors reached Prospect, they were not viewed, attended, fed or watered by any employee or servant of Burlington. They were attended, however, by the third-party defendant Kansas City Stock Yards Company, who, upon the arrival of the cattle in Kansas City, undertook, pursuant to 7 U.S.C.A. § 205, to unload them for feed, water and rest in its Stock Yards. The cattle were required to be so handled as a consequence of the "twenty-eight" hour law, as provided in 45 U.S.C.A. § 71.

On July 16, 1951, a Burlington representative did, however, go to Prospect, Missouri, on the suggestion of the Stock Yard people. When this representative reached Prospect, after all of the foregoing tragic events, it was impossible to determine the ownership of specific cattle, most of which were in bad condition. In order to avoid further loss, defendant consented to the sale of the survivors, allocating the proceeds proportionately to plaintiffs as salvage, without prejudice to whatever further claims plaintiffs might later pursue. On November 10, 1951, plaintiff Little Rock was paid $2,690.80, and on December 6th, $78.37, as its share of the salvage realized. Since the total fair value of the Little Rock cattle before loss was $8,037.24, Little Rock presently asserts, as its claim, the net balance of $5,268.07. Also on November 10, 1951, and December 6, 1951, defendant paid Neuhoff $11,285.94 and $313.48, respectively, as its proportionate share of salvage. Since the total fair value of the Neuhoff cattle before loss was $33,651.16, Neuhoff presently asserts, as its claim, the net balance of $22,051.74. The total fair value of the Ebner cattle before loss was $10,259.22,

Ebner receiving on November 16, 1951, the sum of $3,535.22 as salvage. Therefore, Ebner presently asserts, as its present claim, the net balance of $6,723.63. All parties herein agree that if plaintiffs have a right of recovery, the aforementioned sums claimed represent the fair value of their respective losses. It is further agreed that all plaintiffs herein filed full claims for loss with defendant within the time and manner prescribed in their Uniform Livestock Contracts, and that said claims were duly denied by defendant.

## The Issues.

Plaintiffs herein contend that their losses would not have resulted but for the fact that defendant's negligence contributed to and mingled with an Act of God. More specifically, plaintiffs allege that defendant was negligent in the following respects:

(1) In initially accepting the cattle when it was apprised of flood conditions then existing, and knew (or should have known) that the connecting carriers for the Neuhoff and Ebner cattle, i. e., the M. K. & T. and the St. Louis-San Francisco Railroad, respectively, were no longer operating out of Kansas City, and failing to notify said plaintiffs of that fact;

(2) In unduly delaying the shipments of cattle in arriving at Kansas City;

(3) In failing to place the Little Rock cattle, after their arrival in Kansas City, on board the connecting carrier, Kansas City Southern Railroad;

(4) In holding the cattle at Kansas City for an unreasonable length of time;

(5) In failing to use reasonable care to protect the cattle after the consequences of the flood became apparent.

Defendant denies negligence, claiming that plaintiffs' losses were solely occasioned by an unavoidable, unforeseeable and sudden Act of God. Defendant relies on Sec. 1(a) of the Uniform Livestock Contracts involved herein, which reads as follows:

"Except in the case of its negligence proximately contributing

thereto, no carrier or party in possession of all or any of the live stock herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, quarantine, the authority of law, the inherent vice, weakness, or natural propensity of the animal, or the act or default of the shipper or owner, or the agent of either, or by riots, strikes, stoppage of labor or threatened violence."

Defendant, as third-party plaintiff, alleges that it delivered all the cattle in question to third-party defendants in good health, and that if the third-party plaintiff is accountable to plaintiffs, then it should be indemnified by the third-party defendants, on the ground that if any actionable negligence was committed it was that of the third-party defendants while the cattle were in their possession for transporting, yarding, feeding, watering, guarding and handling.

### Discussion and Conclusions of Law

This Court cannot read the voluminous briefs, testimony and stipulations taken in these cases without becoming painfully conscious of the uncertainties, hopes, anxieties, and vast public confusion that was present in the Kansas City area surrounding those unhappy days from July 10 to July 16, 1951. As in all natural catastrophes which magnify the frailties of humanity, the alternatives which might have been taken that would have led away from destruction, appear, in afterthought and retrospection, as subject of ascertainment, though remaining vague and divergent. Consequently, it must be kept in mind that though the evidentiary facts presently before this Court are clear and for the most part undisputed, nevertheless, what should have been expected, what should have been done, and what could have been avoided during those fateful hours before the visitation of destruction by an Act of God, are questions not readily susceptible to easy answer.

In the case at bar, it is recognized by all parties that to sustain the primary and third-party claims here made it is incumbent upon claimants to establish by competent evidence that some negligence on the part of the carriers involved "concurred in, and contributed to, the loss or injury" occasioned by *vis divina* and for which demand is made. 9 Am.Jur., p. 854. The burden of proof in that respect rests upon the plaintiffs. Memphis & C. R. Co. v. Reeves, 10 Wall. 176, 77 U.S. 176, 19 L.Ed. 909; Transportation Co. v. Downer, 11 Wall. 129, 78 U.S. 129, 20 L.Ed. 160; Southern R. Co. v. Prescott, 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836. Therefore, in resolving the other issues we shall consider those acts of negligence which plaintiffs assert reveal concurring negligence on the part of Burlington, contributing to their claimed losses, in the order as plaintiffs present them.

### (1)

Were Neuhoff's and Ebner's losses the result of concurring negligence on the part of Burlington in failing to notify those claimants that there would be a delay in transportation of their cattle because its connecting carriers, as to those shipments, were known by Burlington to be out of service as a consequence of floods south of Kansas City, which fact was unknown to said claimants at the time the shipments were made?

We think answer thereto must be in the negative. Conceding delay in the transportation of the shipments from Sioux City, Iowa, to Kansas City, and liability on the part of Burlington for any negligence of its connecting carriers resulting in unusual delay, yet the fact is that the claims here made are not for damages occasioned as a result of negligent delay in transit. (In light of the provisions of Section 205, Title 7 U.S. C.A., the third-party defendant Kansas City Stock Yards Company is here treated as a connecting carrier. Its liability for livestock entrusted to it as a "public utility" is tantamount to that of a common carrier. Cf. 50 Am.Jur., p. 660.)

The cattle in question never arrived at point of destination. The instant claims are for total loss of shipment destroyed as a result of alleged negligence while in transit. The measure of damages recoverable in the instant action from those recoverable under a claim for delay in transit point up the distinction. Cf. 9 Am.Jur. 518, 778, etc.

To sustain their instant claims, plaintiffs rely upon the rule stated in 13 C.J.S., Carriers, Sec. 199, p. 403, to the effect that "A carrier must advise the shipper of any circumstance likely to cause delay of which it knows or should know", irrespective of the nature of the cause, and, failing so to do, it will be held liable for damages for delay in delivering the shipment. In support thereof, plaintiffs among other authorities cite Michigan Central R. Co. v. Mineral Springs Manufacturing Co., 16 Wall. 318, 83 U.S. 318, 21 L.Ed. 297; and Atchison, T. & S. F. Ry. Co. v. Jarboe Livestock Commission Co., 10 Cir., 159 F.2d 527, as typical applications of such rule, decisive of the present issue. Neither the rule nor the authorities cited are in point. Loss of goods in transit as a result of accidental fire, as in the Michigan Central case, supra, is not a loss as a consequence of an Act of God, (Cf. 1 C.J.S., Act of God, p. 1427; Miller v. Steam Nav. Co., 10 N.Y. 431; Merchants' Despatch Co. v. Smith, 76 Ill. 542; Chicago & N. W. R. Co. v. Sawyer, 69 Ill. 285; Pope v. Farmers' Union & Milling Co., 130 Cal. 139, 62 P. 384, 53 L.R.A. 673; Dippold v. Cathlamet Timber Co., 111 Ore. 199, 225 P. 202) nor is knowledge of a probable delay in transporting a shipment because of an existing Act of God, as in the Jarboe case, supra, tantamount to a claim for loss in transit directly resulting from such an unforeseen, irresistible force. Regardless of the fact that claimants here may have asserted a claim against Burlington for failure to notify them of probable delay in shipment from facts known by Burlington at the time it received the shipments, yet the fact remains that, assuming such negligent act, it was not the proximate or direct cause of claimants' loss. At the most, it was antecedent and remote thereto. Failure to "deliver within a reasonable time" is the *sine qua non* of liability under the rule relied on by claimants. Absent delivery, such rule is not applicable nor decisive of the issue of "causation" in this action.

(2)

Was delay in transporting the cattle to Kansas City; failure to make connection with Kansas City Southern trains; and, holding the cattle in Kansas City for an allegedly unreasonable length of time a concurring cause of plaintiffs' loss?

 Again, the answer must be in the negative. It is hornbook that an injury or damage cannot be attributed to a cause unless, without it, the injury or damage would not have occurred. In the law of negligence, the principles of proximate and remote cause, though vagariously defined at times, are readily perceived, notwithstanding their application is fraught with difficulty. To make a practical application of "causation" to the facts in the case at bar, it must be kept in mind that we are dealing with facts that reveal abnormal conditions of nature, which are conclusively established as producing the damage complained of, and as to which the charge is made that human agencies contributed to bring about the loss resulting therefrom. Without delving into the intricacies of "causation", we think what is said in Restatement of the Law of Torts, (§ 302, p. 818) regarding negligent acts which create a situation that involves an unreasonable risk, is apropos. In Comment f thereto, it is said:

"The actor is not required to anticipate or provide against conditions of nature or the operation of natural forces which are of so unusual a character that the burden of providing for them would be out of all proportion to the chance of their existence or operation and the risk of harm to others involved in their possible existence or operation.

It is therefore not necessary that **a** particular operation of the natural force be unprecedented. The likelihood of its recurrence may be so slight that in the aggregate the burden of constantly providing against it would be out of all proportion great as compared with the magnitude of the risk involved in the possibility of its recurrence."

When the transportations involved began, floods in and about Kansas City, Missouri, were "really catastrophic." Evidence in the cases at bar delineate the proportions thereof. We need not encumber the record with a detailed recital of such evidence. History already records it. Suffice to say that as to the Central Industrial District in Kansas City, Missouri, levees and flood walls had been erected so that there had been no penetration of that district by flood waters since 1908. The worst flood in that district in the minds of those now living, prior to that in 1951, was in 1903, when protection for the district by way of levees was nowhere in comparison to that provided for the district in 1951. Yet flood waters in 1951 entered the Central Industrial District six feet in excess of that which flooded it in 1903. So extensive was the flood protection for that district on the morning of July 13, 1951, The Kansas City Times reported, "There is no danger to the central industrial district on the Missouri side from the flooding Kaw River." Such assurance circulated through that publication as a report by "Colonel R. P. West, acting Chief of the Kansas City District of Army Engineers" was accepted by thousands who went into the district on that morning to carry on usual business activities. It was not until around daylight on the morning of the 13th that there was any indication that there was a probability the Kansas River might overtop the levees and flood the Central Industrial District. Until that time, the evidence establishes, any reasonably prudent person would have assumed that the Kansas River, then being more than two and one-half feet from the top of the levees protecting the district, would not overflow. Between 6:00 a. m. and 11:00 a. m. on July 13th, there was an unprecedented rise of the Kansas River at Kansas City. Around 7:30 a. m. on that day, the President of the Kansas City Stock Yards Company, Mr. J. B. Dillingham, after viewing the river, became apprehensive and called the Army Engineers, as he had done hourly throughout the night, for the purpose of ascertaining further rises of the river. Until then, there was not, under the facts in the case at bar, probable cause for apprehending the existence of impending danger. Even so, it was not until 9:45 a. m. on that day that the Army Engineers issued an evacuation order applicable to the district. Until daylight on the morning of the 13th, the Kansas City Stock Yards and the Central Industrial District could only be regarded as a place of safety in the midst of an otherwise flood-stricken area, accessible to carriers and the public generally. Carriers serving the district were not impeded in their transportation because of any flood conditions within the district on the Missouri side, until around 10:00 a. m. on the 13th. Prior thereto, any impediments to transportation were south and west of Kansas City, a distance of fifty miles or more. It was not until the 12th day of July, midnight, that flood waters entered the Argentine and Armourdale, Kansas, areas, across the river from the industrial district; which areas were protected by wholly separate flood walls and levees. At that time, the shipments involved had arrived in Kansas City, Missouri.

In the above setting, the shipments were transported and unloaded in the Kansas City Stock Yards. Whether they were delayed in transit, or retained in the Stock Yards an excessive length of time, and not delivered to connecting carriers, did not, and could not under the circumstances shown in evidence, have subjected them to apprehended probable danger, such as actually caused their damage or loss. Therefore, any delay in the transportation of such cattle,

failure to make connections, and causing their unloading at the Stock Yards, were antecedent acts committed by the Burlington, which in nowise contributed or concurred to bring about the danger from which they were damaged. The proximate cause of their loss was the flood. The delay in arrival of the cattle at Kansas City and unloading in the Stock Yards remote causes, so that the maxim, *causa proxima, non remota spectatur*, applies to such acts in premising liability, as was done in Memphis & C. R. Co. v. Reeves, 10 Wall. 176, 77 U.S. 176, 191, 19 L.Ed. 909; and Empire State Cattle Co. v. Atchison, T. & S. F. R. Co., 210 U.S. 1, 28 S.Ct. 607, 52 L.Ed. 931. The latter cited case involved transportations of cattle into the Kansas City Stock Yard during the 1903 flood, under circumstances indistinguishable from those in the case at bar.

■ Notwithstanding the delay in transportation to Kansas City, at the time the cattle actually arrived, there is no evidence before the Court which establishes a then impending danger if the cattle were unloaded in accordance with the 28-hour watering and feeding law, supra. True, the flood conditions about Kansas City had worsened since the cattle left Sioux City, Iowa, but, even at 2:00 a. m. on the 13th when the cattle were unloaded, there was a 2-foot levee clearance protecting the Stock Yards, and there was no indication that the Kansas River would overtop such levees and flood the Central Industrial District. An efficient concurring cause with that of an Act of God which will premise liability for loss must be such as was operative with the Act of God at the time of loss, and which acted contemporaneously therewith to produce the damage; such as made manifest in Pinkerton v. Mo. Pac. R. Co., 117 Mo.App. 288, 93 S.W. 849. As to factual situations, comparable to those in the case at bar, which reveal no concurring cause, see Grier v. St. Louis Merchants' Bridge Terminal R. Co., 108 Mo.App. 565, 84 S.W. 158; Moffatt Commission Co. v.

Union Pac. R. Co., 113 Mo.App. 544, 88 S.W. 117.

(3)

Was defendant negligent in failing to use reasonable care to protect the plaintiffs' cattle after the consequences of the flood became apparent?

■ It cannot be gainsaid that when a carrier knows, or should have known, that goods delivered to it for transportation are in peril or danger of loss or damage the law requires it to use ordinary care, skill and foresight to avoid the consequences thereof. Railroad Co. v. Reeves, supra; Gardner v. Mid-Continent Grain Co., 8 Cir., 168 F.2d 819.

■ From what has heretofore been said, it is apparent that Burlington was not negligent in delivering, and third-party defendants, the Kansas City Connecting Railroad Company and Kansas City Stock Yards Company, were not negligent in receiving the cattle in question and unloading them at the stock yards. At that time, there were no reasonable grounds to believe that in so doing the cattle would be subjected to damage or loss by flood of the stock yards. All the evidence is contra. The testimony shows that as soon as the President of the Stock Yards Company apprehended danger thereto the cattle were moved to an apparent place of safety in the Hog Barns of the Stock Yards Company, which prevented them from drowning. In that location, on account of the flood conditions subsequently ensuing, they were not, and could not be, properly cared for, and the loss here claimed accrued. After the flood sufficiently subsided, the cattle were immediately removed from the Hog Barn and all steps taken, such as a reasonably prudent person would have pursued to minimize the amount of plaintiffs' losses.

■ It is plaintiffs' contention that because no personal representative of the Burlington undertook to care for the cattle while they were in the Hog Barn or being transported to Prospect, Missouri, after the flood waters receded, that

Burlington is conclusively established as being negligent. Such contention overlooks the fact that the evidence establishes that the loss in question accrued while the cattle were in the possession of Burlington's connecting carriers, and that it is only as a consequence of the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.A. § 20(11), that plaintiffs may maintain the instant actions against Burlington for alleged negligence of such connecting carriers. Chicago & E. I. R. Co. v. Collins, 249 U.S. 186, 39 S.Ct. 189, 63 L.Ed. 552. Absent negligence on the part of Burlington, directly contributing to the loss considered from the standpoint of delay in transportation, plaintiffs' claims rest upon a showing of some negligence on the part of Burlington's connecting carriers contributing to and concurring with the *vis major* that is established as the proximate cause of the instant losses. Whatever acts such connecting carriers performed relative to the shipments in question they did as agents of the Burlington. Under the circumstances, Burlington may take advantage of such prudence as was manifested by said carriers, in the same manner as the law cast responsibility on Burlington for any negligence committed by them. There is no charge here made that said carriers were not competent to perform the tasks relegated to them by Burlington, and none such could possibly be made. Every prudent act was pursued by the Stock Yards Company for the protection against loss of plaintiffs' cattle that could reasonably have been taken after danger of loss became reasonably apparent. The testimony is void of any evidentiary fact which would tend to establish that Burlington, acting through its own employees, could or should have done anything other than what was actually done by the Stock Yards Company, in protection of plaintiffs' cattle after danger of loss became reasonably apparent; or to minimize loss thereto after the *vis divina* surrounded them.

In light of the foregoing, plaintiffs have no claim against Burlington for the loss sustained by them as a sole and direct cause of an Act of God, and their complaints must be dismissed. It follows that Burlington's third-party claim against the third-party defendants, the Kansas City Connecting Railroad Company and Kansas City Stock Yards Company, must also be dismissed.

It is so ordered.