B. C. TRUCK LINES, INC., Plaintiff,

v.

PILOT FREIGHT CARRIERS, INC., and E. I. du Pont de Nemours & Company, Inc., Defendants.

Civ. A. No. 7591.

United States District Court
N. D. Georgia,
Atlanta Division.

Nov. 1, 1963.

Louis D. Yancey, Jr., Edgar C. Gentry, Atlanta, Ga., for plaintiff.

Nall, Miller, Cadenhead & Dennis, A. Paul Cadenhead and Theodore G. Frankel, Atlanta, Ga., for defendant Pilot Freight Carriers, Inc.

Alston, Miller & Gaines, Daniel B. Hodgson and Lloyd T. Whitaker, Atlanta, Ga., and Peter J. Nolan of Wilmington, Del., of counsel, for defendant E. I. du Pont de Nemours & Company, Inc.

1

MORGAN, District Judge.

## STATEMENT OF THE CASE

This is an action to recover damages for the loss of cargo, trucking equipment, and terminal facilities in a fire involving 54 drums of sodium peroxide on January 3, 1959. The action is brought by B. C. Truck Lines, Inc. (hereafter called B. C.) at whose terminal the fire occurred. The action is brought against E. I. du Pont de Nemours & Company, Inc. (hereafter called du Pont) manufacturer, packer, and shipper of sodium peroxide, and Pilot Freight Carriers, Inc. (hereafter called Pilot) the initial carrier, which delivered this shipment to B. C. for carriage to point of destination. Pilot, having picked up the drums of sodium peroxide at defendant du Pont's plant at Niagara Falls, New York, delivered same to B. C. in Atlanta, Georgia.

There is no question as to proper alignment of the parties or jurisdiction of this Court.

■ The action was originally brought in three counts—the first sounding in negligence, the second, in breach of express warranty, and the third, in breach of implied warranty. The second and third counts as to Pilot were stricken by this Court on motion for summary judgment on the finding that Pilot had made no such warranties running in favor of the plaintiff and for other reasons. The third count as to du Pont was stricken by the Court on motion for summary judgment on the finding that the specifications of breach of implied warranty related to the same subject matter as those specified under the express warranty count, Count Two, the law being that no implied warranty may exist under those circumstances. See Cohen v. Frima Products, 181 F.2d 324, 325 (C.A. 5, 1590) and C. J. Howard, Inc. v. C. V. Nalley and Company, 44 Ga.App. 311(3), 161 S.E. 380.

With respect to du Pont, the plaintiff specified 21 acts of negligence and 10 breaches of express warranty. These specifications are set out in Footnote 1 below,[1] and may be placed under four topics as follows:

1. The sodium peroxide was not up to proper standard, was improperly manufactured, and was unduly dangerous;

2. The drums were inadequate for shipment of the sodium perox-

---

I. A. *Negligence*

1. Failure to place on the bill of lading notation as to placard required on transporting vehicle, in violation of I.C.C. Regulation No. 73.428(a):

"Section 73.428. *Label or Placard Notation.* (a) The shipping order, bill of lading or other shipping paper must also show thereon in connection with the entry of the article as prescribed in Sec. 73.427, the color or kind of label applied, and for cars containing such articles loaded by the shipper, requiring such placards the kind of placard applied to the car."

2. Failure to place on each drum a consignee label, in violation of Regulation No. 73.401(b):

"Section 73.401. *Dangerous Articles.* (b) Each package of dangerous articles must show the name and address of the consignee except in carloads and truckloads or less-than-truck-loads when handled by a motor vehicle not requiring transfer from one motor carrier to another."

3. Shipment of a commodity which would cause the dangerous evolution of heat and gas in violation of Regulation No. 73.21 (c):

"Section 73.21. *Prohibited Packing.* (c) The offering for transportation of any package or container of any material which will cause a dangerous evolution of heat or gas under conditions normally incident to transportation is forbidden."

4. Shipment of a commodity which would cause the dangerous evolution of heat or gas in violation of Regulation No. 73.21(b):

"Section 73.21. *Prohibited Packing.* (b) The offering for transportation of any package or container of any liquid, solid or gaseous material which under conditions incident to transportation may polymerize (combine to react with itself) or decompose so as to cause dangerous evolution of heat or gas is prohibited. Such materials may be offered for transportation when properly stabilized or inhibited. Refrigeration may

ide under the circumstances involved;

3. The shipping procedures were neither proper nor sufficient; and

4. Insufficient warning was given of the nature of the contents and

be used as a means of stabilization only when approved by the Bureau of Explosives."

5. Use of shipping containers of insufficient strength to prevent leakage of their contents, in violation of Regulation No. 73.24(a):

"Section 73.24. *Design of Containers.* (a) In addition to standing the tests prescribed, the design and construction of inside and outside containers must be such as to prevent the occurrence in individual packages of defects that permit leakage of their contents under ordinary conditions incident to transportation."

6. Failure to place on the outside of each shipping container the name of the contents thereof, in violation of Regulation No. 71.2:

"Section 71.2. *Acts of Congress.* (a) Section 834, Title 18 of the United States Code, approved June 25, 1948 (Pub.Law 772, 80th Congress), provides that whoever knowingly delivers to any common carrier engaged in interstate or foreign commerce by land or water, or carries upon any car or vehicle operated by any common carrier engaged in interstate or foreign commerce by land, any explosive or other dangerous article specified in section 832, under any false or deceptive marking, description, invoice, shipping order or declaration, or *without informing the agent of such carrier, in writing, of the true character thereof, or does not plainly mark on the outside of every package containing explosives or other dangerous article the contents thereof,* shall be fined or imprisoned, or both, as provided in this act." [Emphasis supplied].

7. Failure to use shipping containers of sufficient strength to afford safe handling, reasonable and proper protection of contents and to protect against damage to other goods, in violation of Rule 5, Subsection 8 of the National Motor Freight Classification No. A–4, to-wit:

"*Outer Shipping Containers*

"Section 8. Outer shipping containers must be made of materials of such strength as to afford safe handling, reasonable and proper protection of contents and to protect against damage to other goods. * * *"

how to handle the containers and contents to avoid undue exposure to hazard.

With respect to Pilot, plaintiff specified numerous acts as acts of negligence. Among these specifications may be found

8. Failure to use containers which, when filled, would prevent leakage or sifting, in violation of Rule 5, Subsection 8(h) (5) of the National Motor Freight Classification No. A–4, to-wit:

"Section 8(h) (5) Caps, covers, plugs, or tops made of plastic or metal must be securely fastened, and filled packages must be proof against leakage or sifting."

9. Shipment of a commodity not complying with all of the regulations contained in Parts 71–78 of the I.C.C. Regulations, in violation of that part of I.C.C. Regulations No. 73.1(b), which reads as follows:

"* * * Shipments that do not comply with the regulations in Parts 71–78 must not be offered for transportation."

10. Reduction in drum strength from 16 to 20 gauge without notice to plaintiff, or any participating carrier.

11. Shipment of an inherently dangerous commodity without adequate or sufficient notice or warning to the carrier as to its dangerous propensities or how to avoid the results thereof.

12. Failure to use a shipping container of sufficient strength, proper design, and lacking adequate safeguards to protect the contents thereof, and to avoid damage to other property, in violation of National Motor Freight Classifications No. A–4.

13. Shipment and bailment of an inherently dangerous commodity, which shipment was not fit, safe and suitable for the purpose of the bailment, in violation of du Pont's common law duty.

14. Failure to sufficiently check drums immediately prior to packing to eliminate defective drums.

15. Failure to sufficiently inspect drums at time of packing to eliminate impurities therein.

16. Failure to use plastic linings or bags in drums to minimize leakage into or from said drums.

17. Placing in interstate commerce a shipment of sodium peroxide which was materially more sensitive and dangerous than shipments of normal production sodium peroxide.

18. Failing to brace the shipment in the trailer at the point of origin to prevent same from moving about therein

such allegations as failure to chock and brace the drums, failure to keep the shipment dry during transit, use of inadequate and insufficient trailer, unnecessary transferring of the drums in transit, failure to placard the trailer properly, and improper transportation routing over improper roads.

Both defendants denied they had committed any acts of negligence; du Pont denied that it had breached any express warranties made; and both defendants denied that any of their acts was the proximate cause of the fire. Both defendants asserted, on the other hand, that the fire resulted from the negligent acts of the plaintiff's employees and the failure of these employees to avoid peril known to them or which they should have known.

Pilot, as initial carrier, having paid the cargo loss of $4,346.00 to du Pont, as assignee of the consignee's claim for loss, counterclaimed against plaintiff in that amount.

The case came on regularly for trial before the Court without a jury on the issue of liability only. All parties submitted their evidence together with written argument.

The evidence presented shows that on December 31, 1958, at about 10:00 A.M., at its Niagara Falls, New York, plant, du Pont tendered to Pilot 54 sealed metal drums described as sodium peroxide, weighing 23,139 pounds, for transportation to Prattville, Alabama. The shipment involved in this case was pursuant to a purchase order from Gurney Manufacturing Company, a division of Botany Cottons, Inc., Prattville, Alabama, and under an overriding purchase agreement between Gurney and du Pont. The pertinent provisions of that agreement were: Delivery terms were F.O.B. Niagara Falls, New York, freight paid to Prattville, Alabama for truckloads and seller's liability as to delivery ceased upon making delivery to the carrier at the shipping point in good condition, the carrier acting as Gurney's agent.

The purchase order from Gurney, issued December 4, 1958, directed: "One truckload of Solozone to be shipped on December 31, 1958", and that truckload was appropriated and delivered to Pilot as initial carrier on December 31, 1958. The shipment was manufactured and the quality control tests were made in a proper manner as described below.[2] Of

during transit, failing to instruct Pilot not to transfer said shipment to another trailer enroute, or that if such transfer became necessary, to brace same, as aforesaid.

19. Failure to instruct Pilot that any trailer used for this shipment should be sufficient to protect the shipment from water and moisture.

20. Failure to instruct Pilot that all vehicles transporting said shipment should be plainly placarded with the word "DANGEROUS" and failure to offer such placards to Pilot.

21. In describing the shipment in the bill of lading, du Pont negligently omitted to warn any of the carriers of the nature of said shipment, in that it would initiate a fire and/or an explosion upon contact with water or moisture, and negligently failed to advise said carriers how to avoid a fire and/or explosion when same began chemically reacting, in violation of Section 6 of the Bill of Lading, to-wit:

"Section 6. Every party, whether principal or agent, shipping explosives or dangerous goods, without previous full written disclosure to the carrier of their nature, shall be liable for and indemnify the carrier against all loss or damage caused by such goods, and such goods may be warehoused at owner's risk and expense or destroyed without compensation."

B. *Breach of Warranty*

Identical with Specifications 1, 2, 3, 4, 5, 6, 7, 8, 9 and 21 above.

2. In one of its plant buildings at Niagara Falls, du Pont manufactures sodium peroxide (chemical formula $Na_2O_2$) under the tradename "Solozone". This product is primarily used to bleach fabrics and wood products. It is produced in a two-step process, and after the process is completed, the product is collected in a bin which is emptied periodically into drums for shipment. To insure that the Solozone meets quality standards, samples are taken at the filling of every fifth drum, and the drums are not allowed to leave the production area until the laboratory tests are completed and

the 54 drums comprising this shipment, 25 were packed on December 26, 1958; 25 on December 29th; and 4 on December 30th. All three lots met established production standards.

The 54 drums in which the shipment was packed were manufactured, tested, and shipped by the manufacturers and received by du Pont according to the procedures and specifications described below,[3] and the packing, stencilling, labelling, inspection, and loading were likewise done by du Pont as described below.[4] The testimony was uncontradicted that

it notifies the shipping department that the samples have met all requirements. *Witnesses* for all parties testified that these specifications and procedures were entirely acceptable and proper in the industry.

3. Under the provisions of 18 U.S.C.A. § 835, the Interstate Commerce Commission, utilizing the expert supervisory services of the Bureau for the Safe Transportation of Explosives and Other Dangerous Articles, formulates regulations for the safe transportation of explosives and dangerous articles "in accordance with the best known practicable means of securing safety in transit". These regulations appear as Parts 71–78 of I.C.C. Regulations and also as Explosives and Dangerous Articles Tariff No. 9 of the American Trucking Association, Inc., agent. Regulation § 72.5, being the "Commodity List" of those regulations, classifies sodium peroxide as an oxidizing material and requires the use of Yellow Labels in its shipment. Regulation § 73.187 requires that sodium peroxide be shipped in specification containers, included among which are 37A single trip metal drums. The detailed requirements for the construction of 37A drums are set out in I.C.C. Regulation § 78.131. Pertinent provisions of Specification 37A are these:

*Composition*—Sheets for body and heads to be hot rolled or cold rolled low carbon open hearth or electric steel of standard quality. § 78.131–3.
*Seams*—Side seams must be welded. § 78.131–5.

*Capacities, weights, types and gauges*—For the 33 gallon 400 lb. drums here involved, minimum thickness of body and head sheets is 22 gauge with heavier gauges permitted, and two swedged rolling hoops of sufficient height to clear the closing device when the drum is rolled are required. § 78.-131–6.

*Closures*—Closures must be of full removable head type with gaskets and be adequate to prevent leakage. Detailed specifications are set out, including a required minimum depth cover draw of ¾". § 78.131–7.

*Tests*—Four-foot (approximate distance from truck or car floor to ground) drop tests of full drums in varying positions are required at regular intervals. § 78.131–11.

The undisputed evidence in this case, including that of plaintiff's expert drum witness, concludes that the use of 37A specification drums for the shipment of industrial grade sodium peroxide is reasonable and proper, that is, under conditions normally incident to transportation, 37A specifications were adequate for the shipment of the Solozone. The evidence showed that these drums were manufactured for du Pont by both Fetter Steel Barrel Company of Buffalo, New York, and Inland Steel Container Company of Cleveland, Ohio, and the drums met I. C.C. 37A specifications.

4. The sodium peroxide is shipped from a dock adjacent to the production area from which no other products are shipped except occasional (8,370 pounds in 1958) shipments of sodium monoxide. The shipping supervisor provides the shippers adequate supplies of the four labels used, to-wit:

(1) The "Product Label", pertinent portions of which are "Solozone DFF * * * Dustless and Free Flowing Sodium Peroxide * * * Handling: Avoid Spillage * * * Sweep up spilled material with dry sand and flood with water in the open * * * Storage: Keep container tightly closed at all times. Store in a cool dry location away from acids or combustible matter * * * Fire Hazard: Avoid contact with any combustible material. In case of fire, smother with dry sand. Never use a chemical fire extinguisher. Do not use water unless fire continues. Then flood with large quantities from hose";

(2) "Attention Carrier" label, pertinent portions of which are: "Handle with Care * * * Use No Hooks * * * Keep Dry * * * If Contents Leak * * * Mix immediately with dry sand or earth and clear away all particles with shovel. Destroy by flooding with water in an open space on the ground";

(3) "Notice to Carrier" label, pertinent portions of which are "If this con-

Yellow Labels were present on all the drums, and all who had memory of it testified that the Product and Carrier Labels and Commodity Name stencils were on the sides of all drums. Neither the name nor address of Gurney were on the drums.

The shipment moved on short-form, straight Bill of Lading No. NF34609, dated December 31, 1958, under the terms of which Pilot receipted for the shipment "in apparent good order", subject to the classifications and tariffs in effect on that date, consigned to Gurney at Prattville, Alabama, and routed according to the customer's order by Pilot with the shipment described as: "54 DRS. SODIUM PEROXIDE YELLOW LABEL APPLIED 23,139 [pounds]". The bill of lading contained the prescribed certification by du Pont that "the above named articles are properly described, and are packed and marked and are in proper condition for transportation according to the regulations described by the Interstate Commerce Commission. The bill of lading, being in short form, did not include the provisions of Uniform Freight Classification No. 5, but those provisions were (to the extent not excluded by operation of law or by virtue of the fact that the shipment was of a "dangerous article") applicable, including Section 6 that "every party, whether principal or agent, shipping explosives or dangerous goods, without previous full written disclosure to the carrier of their nature, shall be liable for and indemnify the carrier against all loss or damage caused by such goods.

On December 31, 1958, the drums were loaded onto Pilot's fully enclosed trailer by hand, du Pont's shipper helping Pilot's driver, one Pelligrino, and placing them as directed by Pelligrino. The drums were not braced in the trailer, except by their own weight and relative position. Pelligrino requested, received, and applied the requisite placards, closed the vehicle and left du Pont's plant at about 10:30 A.M., the weather on that date being cold and clear.

The vehicle proceeded to the Niagara Falls plant of the Carborundum Company a few blocks way, and there picked up packages and bundles of abrasive paper or cloth weighing 17,587 pounds, packed in rectangular and cylindrical pasteboard packages. These materials were loaded among, around, and behind the drums, bracing them against movement in shipment. Approximately six of the drums were shifted about in this process. The vehicle proceeded to Buffalo where it was sealed. On the next morning, January 1, 1959, at approximately 4:00 A.M., Pilot's road drivers, Davis and Greene, began the journey to point of destination. The vehicle proceeded to Lexington, North Carolina, without any significant event or occurrence, arriving there at about 11:00 A.M. on January 2nd. At this point, the trailer was opened and the carborundum materials were delivered to the consignee at Lexington and the vehicle continued on to Charlotte, North Carolina, a distance

tainer is severely damaged, broken or leaking in transit telephone collect to [duPont]".

(4) The "Yellow Label" required by ICC Regulations § 73.406 for all flammable solids and oxidizing materials. Pertinent portions of this label are "Keep Away From Fire, Heat and Open-Flame Lights * * * Caution * * * Remove Carefully the Contents of Broken Packages * * * Do Not Drop"; The shipping clerk applies the adhesive to the labels by automatic machine and then places the labels on the drums by hand. The "Notice to Carrier", "Attention Carrier", and "Yellow Labels" are placed between the top rolling hoop and top cover, and the "Product Label" is placed below them, between the two rolling hoops. The shipper also inspects the full drums visually for defects and to see that the stencilling was done. He furnishes placards to the carriers' drivers, if requested, and assists the carriers' drivers in hand-loading the drums onto the motor vehicle backed up to its loading dock, placing the same as directed by those drivers.

The packing, labelling, and shipping procedures as above described were testified to as being satisfactory and acceptable in the industry.

of some 60 miles, arriving there on the same afternoon. During this journey, the drums were not specially braced except by their own weight and position, but this trip was also uneventful. At Charlotte, a breaking point for Pilot, the drums were transferred to a B. & M. stake body trailer which Pilot had on interchange, Pilot's employees using barrel trucks in the process.[5] The drums were observed to be in good condition at this time. On reloading, the drums were securely braced against movement by nailed timbers, the B. & M. trailer was completely covered by a tarpaulin, and that vehicle proceeded into Atlanta without any unusual occurrence. The Pilot driver, one Rhew, left Charlotte about 10:00 P.M., January 2nd, and arrived in Atlanta about 6:00 A.M., Saturday, January 3rd.

Pilot's original drivers did not recall if the drums were labeled or their vehicle was placarded. Pilot's Charlotte dock foreman Hartsell remembered the Yellow Labels but didn't remember if there were more or if the vehicle was placarded. Driver Rhew did not remember if the drums were labeled or the vehicle placarded, but recalled that "Sodium Peroxide" was stencilled on one drum he saw.

Upon arrival at Pilot's terminal in Atlanta, it was found that the designated continuing carrier was not franchised into Prattville, and so Pilot contacted the plaintiff B. C. to determine if it would carry the shipment on to destination, as it had done with like shipments on two previous occasions. B. C., by telephone, agreed and sent its driver Butler to the B. & M. terminal, also in Atlanta, to pick up the load and shipping papers, and driver Yearta to the Pilot terminal to receipt for the load. This occurred shortly after noon on Saturday, January 3, 1959. The drums and shipping papers were received by plaintiff B. C. at its terminal at least by mid-afternoon, and the process of retransferring the drums to B. C.'s trailer began

at or about 4:00 P.M. on Saturday, January 3rd. The evidence is not conclusive as to whether or not the B. & M. trailer was placarded, but at or before that time, the plaintiff B. C. knew from the shipping papers that the shipment was comprised of 54 drums of sodium peroxide and that Yellow Labels were applied to the drums. B. C. issued its own Freight Bill No. 121335, reflecting that information before the fire occurred.

At the time the tarpaulin was removed from the B. & M. trailer, the testimony is undisputed that the drums were properly braced by wooden shoring, that there was no apparent damage to any of the drums, nor was there evidence of internal pressure in them, nor was there any evidence of their leakage on or about the B. & M. trailer, or B. C.'s warehouse floor or within the B. C. trailer to which they were transferred until shortly before the fire occurred.

The drums were in the process of transfer from the B. & M. trailer diagonally across the loading dock onto the B. C. trailer from about 4:00 P.M. until 6:00 P.M. on the Saturday when the fire occurred. B. C. employee Butler worked in the B. & M. trailer assisting B. C. employees Norton and Whitten by "breaking" the drums, that is, tilting them up by hand so that the hand trucks could be run under them and then tilting them back for rolling across the dock. Butler recalls that "Sodium Peroxide" was stencilled on the sides of the drums and that Yellow Labels were on them. Butler had no recollection of previous handling of sodium peroxide by B. C., but he knew that the "Yellow Label" meant to handle with care, testifying, nevertheless, that he had never received any instructions from his employer of methods and risks involved in handling either explosives or dangerous articles of any kind. It was Butler's testimony that all drums were in good condition, without bulge or other evidence of internal pressure and dry to the touch of his hand.

5. Barrel trucks permitted the movers, without aid, to latch onto the drums by a mechanical device and move them gently from one trailer to the other.

The hand trucks being used by B. C. employees Norton and Whitten were not barrel trucks, but were ordinary hand trucks with sharp-pointed tempered steel bills which extended well beyond the sides of these drums. After the drums were first transferred out of the B. & M. trailer across the dock onto the B. C. trailer, they were rearranged twice, some being removed from the trailer in an effort to accommodate a shipment of Coca-Cola vending machines in cardboard cartons. When it appeared that the two shipments could not be accommodated together on the same vehicle, the B. C. employees, having removed the Coca-Cola machines, were in the process of placing the last of the drums back into position when the fire occurred.

B. C. employees Norton and Whitten remembered the Yellow Labels, testifying, nevertheless, that they paid no attention to them, as they "didn't look for them and didn't read them or any other labels". Employee Norton, of B. C., stated that he had never heard of sodium peroxide and didn't remember ever having handled any previously. He admitted that about 15 minutes before the fire occurred, in an effort to place one of the drums in position between two other drums already placed, he took his hand truck, and thrust it forward into the drum in an effort to "bump" it into place. He did bump it into place, but also sheared a gash in the body of the drum several inches above the floor, and the sodium peroxide began to spill onto the floor. When another employee told dock foreman Teal about this, he took a look and commented "it looks like washing powders". He instructed his men: "Push the drum up"; and they did, and slid another in front of it. Shortly thereafter the B. C. employees noticed that the bottom of the punctured drum was turning red hot, and that a fire had begun at its base.

The testimony presented shows that sodium peroxide is extremely hydroscopic in nature, in that it readily absorbs moisture and carbon dioxide from the atmosphere to form a hard caustic called "caking" with the resultant loss of sodium peroxide content. If contacted with liquid water, it reacts to evolve free oxygen and to create intense heat so that if an organic or combustible substance is present at the same time, the ignition point of that substance is considerably reduced. If ignition occurs and sodium peroxide is in ready supply, a continuing fire hazard is presented until the organic material is consumed or isolated from the sodium peroxide, or until large quantities of water are applied to reduce and keep down the temperature. The same hazard is present if, in the place of liquid water, sufficient heat is otherwise supplied, as in the form of friction, such as pushing one drum over the spilled sodium peroxide.

During the year 1958, du Pont shipped 14,073,000 pounds of Solozone from Niagara Falls—99 percent in 37A containers. During the entire last half of 1958, 20 gauge containers were used. Plaintiff B. C. handled two previous shipments of Solozone, in August and October of 1958, both on interchange from Pilot and to the same consignee and point of destination.

Dock foreman Teal, of plaintiff B. C., admitted that he paid no attention to any of the labels on the drums, and that the men had been on the job for some 15 hours and were grumbling about having to move the drums several times in order to make a "paying load". Teal admitted that he saw the hole was knocked in the drum, saw the sodium peroxide spilled out on the floor "looking like washing powders" at the bottom of a drum that was in between two other drums. He admitted telling his men to push another drum up against it, and soon thereafter the fire came about. Teal stated that he didn't think the material was dangerous and never received or gave any instructions about the meaning of I.C.C. labels on any drums.

On observing the fire, the men ran for fire extinguishers which contained the ordinary soda acid variety; one was brought within 10 feet of the B. C. trailer where it was either discharged or

dropped there so that it was discharged in that direction; thereafter, the fire got exceedingly worse, the heat generation became intense as more oxygen was evolved from the sodium peroxide and, as a consequence, the trailer, gasoline tanks, cargo, and other equipment went up in fire.

Thereafter, one Lieutenant Sullivan, of the Atlanta Fire Department, investigated this fire for the City of Atlanta, and upon his arrival about 6:00 P.M., while the fire was in process, was told that it involved a shipment of "sodium sulphate". From his professional experience, he stated he knew it could not be and, thereupon, asked for and received from the B. C. office its Freight Bill No. 121355 which had been prepared to move the shipment on to Prattville. This freight bill repeated the shipment description "54 DRS. SODIUM PEROXIDE YELLOW LABEL APPLIED". Lt. Sullivan also found the used fire extinguisher discharged, with some of the froth discharge still coming from the hose. Also, Lt. Sullivan found one surviving drum on a hand truck in a horizontal position some 10 feet from the back of the B. C. trailer in good condition except for scorching from the fire and saturation from water from the fire hoses. Thereafter, Lt. Sullivan took photographs of the drum remaining after the fire which showed the imprint of where the Product, Attention, and Notice to Carrier labels had been. Sullivan also noticed that "Sodium Peroxide" was stencilled on the drum, and subsequent photographs substantiated his testimony.

Mr. Bender, B. C.'s safety officer, investigated the matter on the following day, Sunday. Bender concluded that the Yellow Label had been present on all drums. Bender also admitted that the Yellow Label meant "extra care" and meant that a handler should read with care any and all other labels present to see how to handle and to avoid mishap. He also testified that there had been no instructional or educational program with B. C. in this regard. Bender admitted that B. C. had no barrel hand trucks, and that for an employee to "bump" a drum, as had been testified to by Norton, amounted to carelessness.

A chemical analysis of the sodium peroxide obtained from the rescued drum showed a reduction of 2.8 percent in the sodium peroxide content, but the testimony indicated that this was not remarkable under the circumstances. All the chemists agreed that it was difficult to compare a test made by each due to the hydroscopic nature of the material.

There being no contradicted evidence, this Court finds that the fire occurred as a result of the following events:

1. The shearing of a gash in the bottom of one of the drums of sodium peroxide by the plaintiff's employee Norton's hand truck, allowing the sodium peroxide to spill upon the wooden floor of the B. C. trailer, thereby placing the material in direct contact with a readily combustible organic material;

2. The shoving of another 400-pound drum with crimp seal bottom over and against the sodium peroxide on the floor to create friction, and thereby to supply sufficient heat to begin the reaction; and then, when the fire began, in a short period of time the entire fire was accelerated by the shooting of water from a soda acid fire extinguisher, in some manner or other, onto the heated area.

From the evidence presented, this Court finds that the fire would not have occurred had the drum not been cut or sheared; that, after it was cut or sheared, had the material been swept up and removed along with the leaking drum away from the rest of the shipment; and had no friction been applied by the B. C. employee sliding the other drum over the floor in front of the broken one.

On the facts as above stated, which are this Court's Findings of Fact, this Court now makes the following

CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and of the parties.

2. With respect to the sodium peroxide (Solozone) involved in this shipment, this Court finds that it was manufactured with due care and in accordance with procedures and standards acceptable to the industry.

3. As to the containers in which this shipment of sodium peroxide was made, this Court finds that the pertinent I.C.C. Regulations concerning the use of "37A" drums for the shipment of sodium peroxide in interstate commerce did, in fact, set safe practice standards for this shipment; that the drums used in this shipment were manufactured with due care in accordance with the pertinent I.C.C. Regulations, that none of them were defective, and that their tops were securely fastened against leakage and sifting. The Court further finds that the drop tests of the drums regularly made were as prescribed by the I.C.C. Regulations; and that the reduction of thickness of body and covers from 16 gauge hot rolled steel to 20 gauge cold rolled steel did not reduce the strength or safety of the drums to any material degree; and that the plastic liners are not prescribed for use in shipping sodium peroxide, are not customarily used, and would not be appropriate for such use under the circumstances involved in the instant case.

4. With respect to labelling and warning, the Court finds that the pertinent I.C.C. Regulations set safe practice standards for warning carriers and users of the hazards involved in handling and using industrial grade sodium peroxide and were followed in this case. The Court further finds that Yellow Labels as required by I.C.C. Regulations § 72.5 and § 73.406 were on all the drums, and that the presence of Yellow Labels on the drums amounted to a warning that the contents were either a flammable solid or oxidizing material. The Court further finds that the drums were all plainly marked with the I.C.C. commodity name of the contents "Sodium Peroxide", which informed all agents and employees of the handling carriers, in writing, of the true character of the contents as required by I.C.C. Regulation § 71.2, and also gave them previous full written disclosure of the nature of the contents as required by Section 6 of Uniform Freight Classification No. 5.

5. The Court further finds that the plaintiff B. C. and its employees were imputed by law with full knowledge of the content and meaning of all I.C.C. Regulations pertinent to this shipment, but that neither I.C.C. Regulation Section 73.401(b) (requiring consignee's name and address on containers) nor Section 73.428(a) (requiring a notation of placarding on bills of lading where rail car shipments are loaded by the shipper) were applicable in this case, nor could a violation of either of them have been the proximate cause of the fire.

6. This Court finds that any failure by du Pont to warn the plaintiff B. C. of a reduction of the thickness of the drum walls and covers from 16 gauge hot rolled to 20 gauge cold rolled steel is immaterial in the case, since there was, as a consequence, no significant reduction in the strength of the drums, there had been no previous handling of such shipments in 16 gauge drums by B. C., there was no recollection of or reliance on the handling of any prior drums by B. C., and such a failure could not have been the proximate cause of the fire.

7. Insofar as shipping procedures are concerned, the Court concludes that the pertinent I.C.C. Regulations set safe practice standards for shipment of industrial grade sodium peroxide, and all were complied with by du Pont.

8. The Court therefore finds that du Pont was not negligent in any of its acts relating to this shipment, and none of its acts or omissions to act was a proximate cause of the fire.

9. This Court finds no act or omission amounting to negligence on the part of co-defendant Pilot that constituted a proximate cause of the fire at the plaintiff's terminal.

10. The Court finds that the acts of the employees of the plaintiff B. C. amounted to acts of negligence which were the direct and proximate cause of

the fire; and even if the fire had been caused by any act or omission of du Pont or Pilot, those negligent acts of B. C.'s employees would, in effect, be the intervening and superseding cause of the fire. Georgia Code Annotated, § 105–603; Atlanta & W. P. R. Company v. Jacobs' Pharmacy, 135 Ga. 113(5), 68 S.E. 1039; Little Rock Packing Co. v. Chicago, B. & Q. R. Company, D.C., 116 F.Supp. 213, 222. See also Taylor v. Atlanta Gas Light Company, 93 Ga.App. 766, 768, 92 S.E.2d 709.

11. The Court finds that the fire would not have occurred had the employees of plaintiff B. C. avoided the peril known to them or the peril of which they were obliged to have knowledge or should have had knowledge under the facts of the case. United States v. Marshall, 230 F.2d 183, 185 (C.A.9, 1956).

12. B. C. has failed to prove negligence or breach of warranty against the shipper du Pont or negligence against the other carrier Pilot, and this is failure of proof as specified. A carrier claiming damages from a shipper or other carrier for negligence or breach of warranty must, in order to prevail, prove the existence of the negligence specified or of the warranty and breach thereof specified, Georgia Code Annotated, § 38–103; Sayre v. Crews, 184 F.2d 723 (C.A.5, 1950), and that such negligence or breach of warranty was the proximate cause of the injury suffered. Hover & Company v. Denver & R. G. W. R. Co., 10 Cir., 17 F.2d 881.

13. This Court finds that the plaintiff B. C. has never carried its original burden of going forward to prove the absence of any negligence on its part, which it is obliged by law to do, shipper du Pont having proved delivery of the shipment in actual good order. Thompson v. James G. McCarrick Co., 205 F.2d 897 (C.A.5, 1953).

14. Pilot, as initial carrier, was liable to du Pont for damage to the cargo, and properly made payment therefor.

15. Pilot, as the initiating carrier, is entitled to recover from B. C., the connecting carrier, the sum which pilot was required to pay to du Pont based upon the negligent acts of the connecting carrier.

16. This Court finds that the plaintiff is not entitled to recover any amount from either of the defendants but that, on the counterclaim, the defendant Pilot is entitled to recover from plaintiff B. C. the sum of $4,346.00. Judgment will be prepared accordingly.